# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

<table>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>IN RE MATCH GROUP, INC.</td><td>)</td><td>CONSOLIDATED</td></tr>
<tr><td>DERIVATIVE LITIGATION</td><td>)</td><td>C.A. No. 2020-0505-MTZ</td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

## MEMORANDUM OPINION

Date Submitted: May 4, 2022
Date Decided: September 1, 2022

Michael Hanrahan, J. Clayton Athey, Corinne E. Amato, Kevin H. Davenport, Jason W. Rigby, Stacey A. Greenspan, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Eric L. Zagar, KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania; *Attorneys for Plaintiffs Construction Industry and Laborers Joint Pension Trust for Southern Nevada Plan A, and Hallandale Beach Police Officers' and Firefighters' Personnel Retirement Trust.*

Blake K. Rohrbacher, Matthew W. Murphy, Sandy Xu, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Maeve O'Connor, Susan R. Gittes, DEBEVOISE & PLIMPTON LLP, New York, New York; *Attorney for Defendants Ann L. McDaniel, Thomas J. McInerney, and Pamela S. Seymon.*

William M. Lafferty, John P. DiTomo, Elizabeth A. Mullin, MORRIS NICHOLS ARSHT & TUNNELL, Wilmington, Delaware; Theodore N. Mirvis, Alexandra P. Sadinsky, Canem Ozyildirim, WACHTELL, LIPTON, ROSEN & KATZ LLP, New York, New York; *Attorneys for Defendants IAC Holdings, Inc., Barry Diller, Joey Levin, Glenn Schiffman, Mark Stein, and Gregg Winiarski.*

David E. Ross, Adam D. Gold, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Blaire Connelly, LATHAM & WATKINS LLP, New York, New York; *Attorneys for Defendants IAC/InterActive Corp., Sharmistha Dubey, Amanda Ginsberg, Alan G. Spoon, and Nominal Defendant, Match Group, Inc.*

**ZURN, Vice Chancellor.**

This case involves a stockholder challenge to a multi-step reverse spinoff initiated by a controller. While the transaction shifted some voting power from the controller to the minority, minority stockholders are dissatisfied with how the transaction diverted cash to the controller at the post-spin company's expense, and how the transaction allocated assets and liabilities between the controller and the post-spin company. Several stockholders filed complaints; this Court consolidated the actions and selected a lead plaintiff.

That lead plaintiff then sold its stock in the post-spin company. A new plaintiff joined the consolidated action, and was appointed co-lead plaintiff. The two lead plaintiffs filed a supplemented and amended complaint alleging direct and derivative claims that the pre-spin company's board, the controller, and the controller's alleged controller breached their fiduciary duties.

The defendants moved to dismiss the operative complaint. They challenge the plaintiffs' standing, and present alternative arguments on the merits. It is undisputed that the reverse spinoff was an interested transaction in which a controller obtained a nonratable benefit at the expense of the minority, presumptively subject to review under the exacting entire fairness standard. The defendants' primary argument on the merits is that the reverse spinoff complied with the framework set forth in *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014) ("*MFW*"), thus subjecting the transaction to business judgment review. The plaintiffs argue the

1

defendants have not satisfied four of the six elements of the *MFW* framework. The defendants' fallback position asserts the transaction was entirely fair.

For the reasons explained below, I conclude that standing is limited to the second-to-arrive lead plaintiff's standing to bring direct claims, and that the process as pled satisfied *MFW*. Thus, the separation is subject to review under the business judgment standard, and this matter must be dismissed.

## I.     BACKGROUND[1]

Defendant IAC/InterActiveCorp ("Old IAC") was an internet and media company incorporated in Delaware. "IAC's business model is predicated on acquiring businesses, growing them, and then spinning off or separating them from IAC."[2] In 1999, Old IAC acquired Match.com, a business that has consistently been a market leader in online dating products in the United States and Europe.[3] In 2009, nominal defendant Match Group, Inc. ("Old Match") was incorporated in Delaware

---

[1] I draw the following facts from the Amended and Supplemented Verified Consolidated Stockholder Class Action and Derivative Complaint, the documents attached and integral to it, and public filings. Docket Item ("D.I.") 87 [hereinafter "Am. Compl."]; *see, e.g.*, *Windsor I, LLC* v. *CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 873–75 (Del. 2020); *Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at *2 (Del. Ch. Dec. 28, 2018); *In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014); *In re Rural Metro Corp. S'holders Litig.*, 2013 WL 6634009, at *7 (Del. Ch. Dec. 17, 2013) ("Applying [Delaware] Rule [of Evidence] 201, Delaware courts have taken judicial notice of publicly available documents that 'are required by law to be filed, and are actually filed, with federal or state officials.'" (quoting *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 584 (Del. Ch. 2007))).

[2] Am. Compl. ¶ 39.

[3] Am. Compl. ¶¶ 35, 41; Proxy at 139.

as an Old IAC subsidiary to hold Match.com and other dating sites Old IAC had acquired.[4]  As of 2015, Old IAC was Old Match's controlling stockholder, holding 98.2% of its voting power by virtue of owning 24.9% of Old Match's outstanding publicly traded common stock and all of Old Match's Class B high-vote common stock.[5]

This action concerns a 2019 series of transactions (the "Separation") by which Old IAC separated its dating businesses and some debt obligations (the "Exchangeables") from the rest of its business.  The Separation was accomplished by a transaction agreement dated December 19, 2019 (the "Transaction Agreement").[6]

In the Separation, Old IAC formed a subsidiary and spun its other businesses off to that subsidiary, IAC/Interactive Corp., referred to here as "New IAC."[7]  So

---

[4] Am. Compl. ¶ 41; Proxy at 139.  As of 2019, Old Match's "portfolio of brands include[d] Tinder®, Match®, Meetic®, OkCupid®, Hinge®, Pairs™, PlentyOfFish®, and OurTime®, as well as a number of other brands, each designed to increase users' likelihood of finding a meaningful connection."  Am. Compl. ¶ 35 (quoting Match Group, Inc., Annual Report (Form 10-K) (Feb. 27, 2020), at 3 [hereinafter "2019 Form 10-K"]) (internal quotation marks omitted).

[5] Am. Compl. at 1; IAC/InterActiveCorp and Match Group, Inc., Joint Proxy Statement/Prospectus (Form 424B3) (Apr. 30, 2020), at Joint Proxy Statement/Prospectus [hereinafter "Proxy"]; *see also* Am. Compl. ¶ 42.

[6] Proxy at Joint Proxy Statement/Prospectus, xx; 2019 Form 10-K at Ex. 2.2* [hereinafter "Transaction Agr."] at Recitals.

[7] Proxy at xx, 1–2; *id.* at 67 ("[Old] IAC today operates Vimeo, Dotdash and Care.com, among many other businesses, and also has majority ownership of both Match Group, which includes Tinder®, Match®, Meetic®, OkCupid®, Hinge®, Pairs™, PlentyOfFish® and OurTime®, and ANGI Homeservices, which includes HomeAdvisor, Angie's List and

divested, Old IAC held the Exchangeables and a stake in Old Match. Old IAC reclassified its two classes of high-vote and publicly traded stock into one class of common stock, and became known as "Match Group Inc.," here "New Match."[8] The reclassification decreased IAC's voting control in New Match. Then, Old Match merged with and into a New Match merger subsidiary; in that merger, minority Old Match stockholders received New Match stock. The merger subsidiary survived as a New Match subsidiary, and Old Match ceased to exist.[9]

The Separation is illustrated in the diagram below.[10]

---

Handy. . . . IAC Holdings, Inc. [New IAC] is a Delaware corporation and a direct wholly owned subsidiary of IAC that was formed on November 19, 2019 for the purpose of holding the historical businesses of IAC (other than [Old] Match and the exchangeable notes issuers) following the Separation.").

[8] Proxy at xx; Am. Compl. ¶ 1.

[9] Am. Compl. ¶ 191; Proxy at 68; Transaction Agr. § 2.03(d).

[10] Proxy at 139; D.I. 93, at 10 [hereinafter "MOB"].



## A. The Parties

Plaintiffs Construction Industry and Laborers Joint Pension Trust for Southern Nevada Plan A ("Nevada") and Hallandale Beach Police Officers' and Firefighters' Personnel Retirement Trust ("Hallandale" and together with Nevada, "Plaintiffs") were stockholders in Old Match. Nevada was a New Match stockholder for a time; Hallandale still is.

The Amended Complaint names each of the ten Old Match directors as individual defendants: Sharmistha Dubey, Amanda Ginsberg, Joey Levin, Ann McDaniel, Thomas McInerney, Pamela Seymon, Glenn Schiffman, Alan Spoon, Mark Stein, and Gregg Winiarski (the "Director Defendants").

Plaintiffs also name as a defendant Barry Diller, Chairman and Senior Executive of Old IAC. Plaintiffs allege Diller owes fiduciary duties as Old IAC's controller. Before the Separation, Diller and members of his family collectively held over 42% of Old IAC's total outstanding voting power.[11] Diller personally owned approximately 8.5% of Old IAC's economic interest.[12] Plaintiffs have not alleged that Diller owned any Old Match stock.

### B. The Separation Favors New IAC Over New Match.

Plaintiffs allege Old IAC, as Old Match's controller, orchestrated the Separation to New IAC's benefit but to the detriment of Old Match and New Match minority stockholders. They allege the Separation left New Match with Old IAC's Exchangeables, approximately 60% of the cost of Old IAC's options,[13] and potential litigation liabilities, and loaded New Match down with staggered and handsomely

---

[11] Am. Compl ¶ 37 ("As of April 15, 2020, Diller and his family collectively held shares of Class B common stock and common stock that represented approximately 42.4% of the total outstanding voting power of IAC."); Proxy at 270 (indicating Diller owned 8.4% of Old IAC common stock, and 100% of Old IAC Class B common stock, representing 42.9% of all classes).

[12] Am. Compl. ¶ 157; Proxy at 270.

[13] Am. Compl. ¶ 164 (alleging the Separation Committee "[f]ailed to get IAC to bear more than 40% of the pre-tax cost of the intrinsic value of outstanding IAC stock options"). The cost of the options was one of four components in the numerator of Old IAC's exchange ratio for New Match stock in the reclassification. Am. Compl. ¶¶ 112, 129(c), 134, 145, 164; Proxy at xxi–xxii, 3, 180–83; Transaction Agr. at Annex A (defining "Reclassification Exchange Ratio").

6

compensated directors loyal to IAC.[14]  New Match also purchased Old IAC's real estate and tax attributes, with the tax benefits flowing to New IAC.  New IAC also enjoyed favorable tax treatment for the Separation, while both companies agreed to refrain for two years from engaging in any post-Closing transactions that might jeopardize the Separation's tax-free status.[15]

Plaintiffs allege the Separation stocked New IAC with cash.[16]  By augmenting Plaintiffs' pleadings with public filings, I understand New IAC to have extracted cash from New Match in three principal ways.  First, Old IAC conducted an equity offering of what would become New Match common stock (the "Equity Offering"), from which New IAC would receive up to $1.5 billion in proceeds, while Old IAC's interest in New Match was only fractionally diluted.[17]  Second, Old IAC received a "dividend" of $3.00 for each Old Match share it held, totaling $680 million.[18]  This

---

[14] Am. Compl. ¶ 167; Proxy at 9, 64; Transaction Agr. § 7.18.  The Transaction Agreement set the New Match Board at eleven directors, but the First Amendment reduced the size to ten directors.  *Compare* Transaction Agr. § 7.18(a), *with* Match Group, Inc., Current Report (Form 8-K) (Apr. 28, 2020), at Ex. 2.1 ¶ 2 [hereinafter "First Amendment"].

[15] Proxy at 22, 58, 161, 201–03; Am. Compl. ¶¶ 52, 138, 171, 179.

[16] *See, e.g.*, Am. Compl. ¶¶ 118, 160, 169.

[17] Proxy at xxi–xxii, 3, 12, 138, 179, 195, 180–83; Transaction Agr. § 7.17(c)–(d); Match Group, Inc., Annual Report (Form 10-K) (Feb. 25, 2021), at 31, 87, 99; Am. Compl. ¶¶ 118, 129(b), 130(e), 149, 155.  The Equity Offering diluted Old IAC only insofar as it decreased one of four components of the numerator of Old IAC's exchange ratio in the reclassification.  Proxy at Joint Proxy Statement/Prospectus; *see also* Proxy at xxi–xxii, 3, 180–83; Transaction Agr. at Annex A (defining "Reclassification Exchange Ratio").

[18] Proxy at 11–12, 149, 194–95, 247; Am. Compl. ¶ 10 (referencing IAC's portion of a "dividend"), *id.* ¶ 134 (same); *id.* ¶ 164 (same).

payment was funded by a loan from Old Match to Old IAC in the amount of $3.00 times the number of outstanding shares of Old Match capital stock outstanding at the time of the Separation (the "Dividend Loan").[19] And third, depending on how Old Match minority stockholders elected to obtain their merger consideration, Old IAC could receive an additional $3.00 per Old Match minority share, up to an additional $163 million.[20] This payment was also funded by the Dividend Loan.[21] Old IAC contributed those proceeds to New IAC, while New Match assumed the Dividend Loan.[22]

Plaintiffs contend Old Match's fiduciaries acceded to the Separation's unfavorable terms because they incorrectly believed Old Match was contractually bound to do so. In 2015, in connection with Old Match's IPO, Old Match and Old IAC had agreed to a suite of agreements governing any future "Distribution" of Old IAC's interest in Old Match to its stockholders as defined in those agreements. Relevant here, a 2015 Tax Sharing Agreement required Old Match to "take all necessary steps to maintain tax consolidation with [Old] IAC in anticipation of an eventual tax-free spinoff" of Old IAC's interest in Old Match.[23] And an Investor

---

[19] Proxy at 11–12, 149, 194–95, 247.

[20] *Id.* at 11–12, 68, 149, 194–95, 247.

[21] *Id.* at 11–12, 194–95, 247.

[22] *Id.*

[23] Am. Compl. ¶ 4; *id.* ¶¶ 45, 49; 2019 Form 10-K at 8; *id.* at Ex. 10.4 (attaching the 2015 Tax Sharing Agreement); Match Group, Inc., Annual Report Amendment No. 1 (Form 10-

Rights Agreement provided Old IAC with specified registration and other rights relating to its shares of Old Match's common stock and anti-dilution rights.[24] Section 3.1 of the Investor Rights Agreement states: "At any time after the [2015 IPO transaction's] Effective Date, if [Old] IAC advises [Old] Match that [Old] IAC intends [to] dispose of all or a portion of its interest in [Old] Match (including by way of a distribution to [Old] IAC's shareholders), [Old] Match agrees to cooperate and take all action reasonably requested by [Old] IAC to facilitate such a transaction."[25] Plaintiffs contend that Old Match directors negotiated the 2019 Separation as if they were constrained by the 2015 Agreements, when the Separation did not trigger those agreements; and that the Separation's disclosures about the role of the 2015 Tax Sharing Agreement and Investor Rights Agreement are "materially misleading and incomplete."[26]

The Separation was not subject to the 2015 Tax Sharing Agreement. Instead, the parties negotiated a superseding 2019 Tax Matters Agreement that "govern[ed]

---

K/A) (Apr. 29, 2020), at 24 [hereinafter "2019 Form 10-K/A"]; *id.* at Ex. 10.4 (attaching the 2015 Tax Sharing Agreement).

[24] Am. Compl. ¶¶ 4, 45, 48; 2019 Form 10-K at 8; *id.* at Ex. 4.2 (attaching the Investor Rights Agreement); 2019 Form 10-K/A at 24; *id.* at Ex. 4.2 (attaching the Investor Rights Agreement).

[25] Am. Compl. ¶ 48 (internal quotation marks omitted) (quoting Match Group, Inc., Current Report (Form 8-K) (Nov. 24, 2015), at Ex. 4.1); *see also* 2019 Form 10-K at Ex. 4.2 § 3.1; 2019 Form 10-K/A at Ex. 4.2 § 3.1.

[26] Am. Compl. ¶¶ 13, 174–78.

the parties' respective rights, responsibilities and obligations with respect to taxes (including responsibility for taxes, entitlement to refunds, allocation of tax attributes, preparation of tax returns, control of tax contests and other tax matters)."[27]

### C. The Process

The Separation was the result of approximately two months of negotiations between an Old Match separation committee (the "Separation Committee") and Old IAC. Plaintiffs contend this process was unfair, that the Separation Committee was not independent, and that the Old Match board of directors (the "Board") negotiated under the misimpression that the Separation was subject to the restrictions in the 2015 Agreements.

#### 1. The Separation Committee

On August 7, 2019, Old IAC announced that it was considering separating Old Match from Old IAC. On September 18, before Old IAC made any proposal to Old Match, the Board formed the Separation Committee to negotiate with Old IAC.[28] The Board's resolutions establishing the Separation Committee state in pertinent part:

---

[27] Proxy at 201; *see also id.* at 22, 58, 152, 201–03, I-30.

[28] Am. Compl. ¶¶ 7, 91; Proxy at 141.

RESOLVED, FURTHER, that the Separation Committee is hereby authorized to structure, review, evaluate, negotiate and propose the terms and conditions of a Separation Transaction (or any offer or indication of interest therefor) including (1) establishing, approving, modifying, monitoring and directing the process and procedures related to the review and evaluation of a Separation Transaction, including the authority to determine not to proceed with any such process, procedures, review or evaluation, (2) reviewing, evaluating and investigating the terms and conditions of a Separation Transaction, (3) negotiating with any of the IAC Parties or any other party with respect to the terms and conditions of a Separation Transaction, and, if the Separation Committee deems it appropriate and in its sole discretion, disapproving a Separation Transaction, or, alternatively, but subject to the limitations of applicable law, to approve the execution and delivery of documents setting forth a Separation Transaction on behalf of the Company and (4) supervising and directing the management of the Company in regard to the conduct of such negotiations should the Separation Committee, in its sole discretion, authorize management to conduct or participate in such negotiations;

RESOLVED, FURTHER, that the Separation Committee is hereby authorized to determine whether a Separation Transaction is advisable and fair to and in the best interests of the Company and all of its stockholders (or any subset of the stockholders of the Company that the Separation Committee determines to be appropriate) and to recommend to the Board whether the final terms of a Separation Transaction are in the best interests of the Company and should be approved by the Board;

RESOLVED, FURTHER, that the Board shall not be permitted to authorize the execution or delivery of documents setting forth a Separation Transaction or the consummation of a Separation Transaction without the recommendation of the Separation Committee;[29]

---

[29] D.I. 91 [hereinafter "IAC OB"], Exhibit 14 at MATCH-0000015–16 [hereinafter "September 18, 2019 Resolutions"]. The Amended Complaint quotes and cites the Match Group Inc. Board Meeting Minutes dated September 18, 2019. Am. Compl. ¶¶ 7, 65 & n.61. I may consider this document as integral to the Amended Complaint. *Fortis Advisors*

The Old Match Board appointed McInerney, Seymon, and McDaniel to the Separation Committee.[30] McInerney was CEO of Altaba, Inc. (formerly Yahoo! Inc.) and Old IAC's former CFO.[31] The Old Match Board appointed McInerney as a director because of "his extensive senior leadership experience at IAC and his related knowledge and experience regarding Match Group, as well as his high level of financial literacy and expertise regarding restructurings, mergers and acquisitions and operations, and his public company board and committee experience."[32]

Seymon worked at Wachtell, Lipton, Rosen & Katz ("Wachtell") for nearly thirty years, often representing IAC affiliates, and retired as a partner in 2011.[33] "In determining that Ms. Seymon should serve as a director, the Board considered her extensive experience representing public and private corporations in connection with a wide array of complex, sophisticated and high profile matters, as well as her high level of expertise generally regarding mergers, acquisitions, investments and other strategic transactions."[34]

*LLC v. Allergan W.C. Hldg. Inc.*, 2019 WL 5588876, at *3 (Del. Ch. Oct. 30, 2019) (finding documents were integral to the complaint where the documents plaintiff referenced in its complaint "form[ed] the factual foundation of its claim, and therefore [were] integral to the claim").

[30] Am. Compl. ¶¶ 12, 24–26; September 18, 2019 Resolutions at MATCH-0000015.

[31] Am. Compl. ¶¶ 67, 210–11; 2019 Form 10-K/A at 4–5; *see* MOB at 7 n.4.

[32] 2019 Form 10-K/A at 5.

[33] Am. Compl. ¶¶ 26, 71, 75; 2019 Form 10-K/A at 5.

[34] 2019 Form 10-K/A at 5.

McDaniel is a consultant and former senior vice president of Graham Holdings Company ("GHC") (formerly The Washington Post Company). The Old Match Board thought McDaniel should be a director because of her "extensive human resources experience, which the Board believes give her particular insight into personnel and compensation matters, as well as her management experience with Newsweek, which the Board believes gives her insight into business strategy, leadership and marketing."[35]

The Separation Committee's mandate provided that it could hire its own advisors. First, it hired Debevoise & & Plimpton LLP ("Debevoise") as its legal advisor. The Separation Committee then considered three possible financial advisors, and eventually hired Goldman Sachs & Co. LLC ("Goldman Sachs").[36] According to Plaintiffs, "Goldman Sachs disclosed at the October 3, 2019 meeting that it was a counterparty to [Old] IAC on call spreads on two of the convertible notes (the 'Exchangeables')."[37] Goldman Sachs also disclosed this in its relationship disclosure letter.[38] The letter discloses that some of Goldman's Old Match team

---

[35] *Id.* at 4.

[36] Am. Compl. ¶¶ 78, 84, 122; Proxy at 142.

[37] Am. Compl. ¶ 79; *accord* ¶ 82; Proxy at 142.

[38] IAC OB, Exhibit 20 at MATCH-0001885 [hereinafter "Disclosure Letter"]. The Amended Complaint quotes and cites Goldman Sachs's Disclosure Letter dated October 3, 2019 at Appendix I, page 10. Am. Compl. ¶¶ 79, 81, 83 & nn. 76, 78. I may consider this document as integral to the Amended Complaint. *Fortis Advisors*, 2019 WL 5588876, at *3.

were on an Investment Banking Division team "serving IAC and Match,"[39] specifies that the Investment Banking Division provided underwriting services to IAC, Match, and another IAC subsidiary, Expedia, and states that "divisions . . . other than the Investment Banking Division may have relationships with Barry Diller, including his family office, and his affiliates."[40] After discussion, and with Debevoise's guidance, the Separation Committee retained Goldman Sachs.[41]

On October 10, Old IAC shared its initial proposal with Old Match, which was conditioned on the vote of the majority of the minority Old Match stockholders.[42] From there, the Separation Committee negotiated with Old IAC for approximately two months.[43] This included nearly forty meetings among the counterparties' representatives and advisors.[44] During the course of negotiations,

---

[39] Am. Compl. ¶ 83 (emphasis omitted) (citing Disclosure Letter at MATCH-0001893); Proxy at 142.

[40] Disclosure Letter at MATCH-0001885, 1887–92.

[41] Am. Compl. ¶¶ 78, 84, 122; Proxy at 142, 146.

[42] Am. Compl. ¶¶ 14, 85(k); Proxy at 143 ("The representatives of Wachtell Lipton communicated that the initial proposal remained subject to the approval of the IAC board of directors, that entry into any transaction would be subject to the favorable recommendation of the Match separation committee, and closing of any transaction would be conditioned on the affirmative vote of a majority of the shares held by disinterested stockholders of Match and other customary closing conditions.").

[43] *Compare* Am. Compl. ¶ 85 ("On October 10, 2019, [Wachtell] on behalf of the [Old] IAC Board and [Old] IAC management, conveyed to [Debevoise], a preliminary proposal for the separation transaction."), *with id.* ¶¶ 147–48 (explaining the series of events that led to the December 19, 2019 agreement between the parties), *and* Proxy at 152 (same).

[44] Proxy at 142–52.

the Separation Committee met as a full committee at least twenty times and exchanged half a dozen proposals with Old IAC.[45]

Old IAC's proposals reflected demands for several billion dollars in a cash dividend, which it initially proposed would be financed by new debt.[46] The Separation Committee and its advisors considered various avenues to accommodate and decrease Old IAC's demand for cash, such as a smaller dividend or proceeds from the Equity Offering.[47] The Separation Committee negotiated a "57.5%" reduction of Old IAC's dividend request,[48] which ultimately took the forms of the proceeds of the Equity Offering, $3.00 per Old IAC share of Old Match, and the additional payments keyed to minority Old Match stock elections.

The Separation Committee also negotiated improvements in other aspects of the Separation. It obtained a favorable adjustment to the reclassification exchange ratio, and compensation for 40% (as opposed to 0%) of the Old IAC options

---

[45] Am. Compl. ¶¶ 85–86, 89, 94, 99, 101–02, 106, 109–14, 118, 121, 123–24, 129–34, 137–38, 141–44, 147; Proxy at 142–51, 159.

[46] Am. Compl. ¶¶ 85, 114, 118, 130; Proxy at 142–47, 149.

[47] Am. Compl. ¶¶ 10, 106, 112, 114, 129(a), 133–34, 138; Proxy at 144–49.

[48] *Compare* Am. Compl. ¶¶ 85(b), 106(b), *with* Am. Compl. ¶¶ 134, 138(a).

converted into New Match options.[49]  And it negotiated the new 2019 Tax Matters Agreement that superseded the 2015 Tax Sharing Agreement.[50]

### 2. The Parties Execute An Agreement, And Then Amend That Agreement.

On December 18, 2019, the parties reached agreement.  The Separation Committee recommended the Old Match Board approve the Separation.[51]  The next day, following the Old IAC Board's "approval by unanimous written consent . . . approving [Old] IAC's entry into the transaction agreement and ancillary agreements, the parties entered into the transaction agreement[,] [a] real estate transfer agreement[,]" and the 2019 Tax Matters Agreement.[52]

On April 28, 2020, the transaction parties executed a letter amending the transaction agreement (the "First Amendment") to reduce the size of the New Match Board to ten from eleven, cap the Equity Offering at $1.5 billion, and revise the method of calculating IAC's proceeds from the Equity Offering.[53]

On April 30, the Old Match and Old IAC Boards issued a joint proxy statement and prospectus (the "Proxy"), which incorporates Old Match's 2019 Form

---

[49] Am. Compl. ¶¶ 85(h), 106(e), 129(c), 134, 138(b), 145, 164; Proxy at 141–52, 157–61, 180–83.

[50] Proxy at 22, 58, 152, 201–03, I-30.

[51] Am. Compl. ¶¶ 147–48; Proxy at 152.

[52] Proxy at 152; *id.* at 52, 201–03.

[53] Am. Compl. ¶ 149; Transaction Agr. §§ 7.17(c)–(d); First Amendment ¶¶ 2, 4–5.

10-K (the "2019 Form 10-K") and its amendment in an April 29, 2020 Form 10-K/A (the "2019 Form 10-K/A").[54] The 2019 Forms 10-K and 10-K/A attach each of the 2015 Agreements as exhibits.[55]

On June 9, Old IAC entered into subscription agreements to facilitate the Equity Offering, selling 17,339,035 shares of New Match common stock at $82.00 per share.[56] On June 22, the parties entered into a second letter agreement amending the transaction agreement (the "Second Amendment"), changing how Old Match minority stockholders would receive part of their merger consideration.[57] Both Old IAC and Old Match filed Form 8-Ks disclosing and attaching each amendment the same day they were executed.[58]

On June 25, Old IAC and Old Match each held a special stockholder meeting to vote on the Separation and the related transactions.[59] The stockholders of both

---

[54] Am. Compl. ¶ 150; Proxy at 1–2, 19, 308–09.

[55] 2019 Form 10-K at Ex. 4.2 (attaching the Investor Rights Agreement); *id.* at Ex. 10.4 (attaching the 2015 Tax Sharing Agreement); 2019 Form 10-K/A at Ex. 4.2 (attaching the Investor Rights Agreement); *id.* at Ex. 10.4 (attaching the 2015 Tax Sharing Agreement).

[56] Am. Compl. ¶ 151; IAC/InterActiveCorp, Current Report (Form 8-K) (July 1, 2020), at Item 8.01; Transaction Agr. § 7.17(c).

[57] Am. Compl. ¶ 152; Match Group, Inc., Current Report (Form 8-K) (June 22, 2020), at Ex. 2.1 ¶ 3 [hereinafter "Second Amendment"].

[58] *See generally* First Amendment; IAC/InterActiveCorp, Current Report (Form 8-K) (Apr. 28, 2020), at Ex. 2.1 (attaching First Amendment); Second Amendment; IAC/InterActiveCorp, Current Report (Form 8-K) (June 22, 2020), at Ex. 2.1 (attaching Second Amendment).

[59] Am. Compl. ¶ 153; Match Group, Inc., Current Report (Form 8-K) (June 29, 2020), at Item 5.07; IAC/InterActiveCorp, Current Report (Form 8-K) (June 29, 2020), at Item 5.07.

entities voted to approve those transactions; approximately 75% of Old Match's minority stockholders voted in favor of the Separation.[60]

### 3. The Parties Consummate The Merger And Finalize The Separation.

On June 30, the parties consummated the multi-step Separation, accomplishing a reverse spinoff of Old IAC's non-Match assets to New IAC, and then a merger between Old Match and Merger Sub to complete New Match's corporate structure.[61] By July 2, New Match's Board consisted of eleven directors: Dubey, Levin, McDaniel, McInerney, Schiffman, Seymon, Spoon, and four new directors.[62]

---

[60] Am. Compl. ¶¶ 14, 153; Match Group, Inc., Current Report (Form 8-K) (June 29, 2020), at Item 5.07; IAC/InterActiveCorp, Current Report (Form 8-K) (June 29, 2020), at Item 5.07.

[61] Am. Compl. ¶ 154; Match Group, Inc., Quarterly Report (Form 10-Q) (Aug. 10, 2020), at 11 ("On June 30, 2020, the companies formerly known as Match Group, Inc. (referred to as 'Former Match Group') and IAC/InterActiveCorp (referred to as 'Former IAC') completed the separation of the Company from IAC through a series of transactions that resulted in two, separate public companies—(1) Match Group, which consists of the businesses of Former Match Group and certain financing subsidiaries previously owned by Former IAC, and (2) IAC/InterActiveCorp, formerly known as IAC Holdings, Inc. ('IAC'), consisting of Former IAC's businesses other than Match Group (the 'Separation').").

[62] Am. Compl. ¶¶ 155, 201. While the First Amendment established a ten-director board, once those ten directors were appointed, they elected to expand the board back to eleven, as originally contemplated in the Transaction Agreement. *Compare* First Amendment ¶ 2 (amending Transaction Agreement Section 7.18(a) to establish a board of ten directors), *with* Match Group, Inc., Current Report (Form 8-K) (July 2, 2020), at Item 5.02 ("Following the appointment of the aforementioned directors, the Company's board of directors approved the expansion of the size of the board of directors from 10 to 11 directors . . . ."); Transaction Agr. § 7.18(a); Proxy at 9, 64.

### E. The Litigation

On June 24, 2020, plaintiff David Newman filed a Derivative and Stockholder Class Action Complaint in this action, C.A. No. 2020-0505-MTZ.[63] Defendants filed opening briefs in support of their motions to dismiss Newman's complaint on September 24.[64] On January 7, 2021, Nevada filed a Verified Stockholder Class Action and Derivative Complaint in a separate action captioned *Construction Industry and Laborers Joint Pension Trust for Southern Nevada Plan A v. IAC/InterActiveCorp*, C.A. No. 2021-0017-MTZ.[65] On January 8, Newman joined Boilermakers Annuity Trust to file an Amended Derivative and Stockholder Class Action Complaint.[66] On January 21, the Court consolidated the two actions into this action, and on March 15, appointed Nevada to serve as lead plaintiff (the "Leadership Order").[67] On April 14, Nevada filed a Verified Consolidated Complaint.[68] Defendants again moved to dismiss and filed opening briefs in support thereof on June 22.[69]

---

[63] D.I. 1.

[64] D.I. 7; D.I. 9; D.I. 11; D.I. 22; D.I. 29.

[65] D.I. 43, at 3; Verified Stockholder Class Action and Derivative Complaint, *Constr. Indus. & Laborers Joint Pension Tr., et al. v. IAC/Interactivecorp, et al.*, C.A. No. 2021-0017-MTZ (Del. Ch. Jan. 7, 2021), D.I. 1.

[66] D.I. 40.

[67] D.I. 43; D.I. 62.

[68] D.I. 64.

[69] D.I. 69.

On August 12, Plaintiffs filed a letter indicating that Nevada sold its New Match stock and "[a]s a result, Nevada is no longer a Match stockholder and, under Court of Chancery Rule 23.1, cannot continue to pursue the derivative claims pled in the Complaint."[70] On September 3, Hallandale filed motions for permissive joinder, amendment of the Leadership Order to include Hallandale as co-lead plaintiff, and for leave to amend and supplement the April 14 complaint.[71] Defendants did not oppose these motions but reserved all rights.[72] The Court granted those motions and on November 2, Plaintiffs filed an Amended and Supplemented Verified Consolidated Stockholder Class Action and Derivative Complaint (the "Amended Complaint").[73]

Through the Amended Complaint, Plaintiffs allege Defendants breached their fiduciary duties in connection with the Separation, a conflicted controller transaction. IAC stood on both sides of the Separation, as the controlling stockholder of Old Match and as the Separation's beneficiary as New IAC. Specifically, Plaintiffs contend New IAC obtained significant benefits in the

---

[70] D.I. 76, at 1.

[71] D.I. 77; D.I. 79.

[72] D.I. 43 ¶ 11 ("This Stipulation and Order shall not prejudice the right of any party to raise any and all arguments, objections, motions or defenses concerning the claims raised in the Newman Action, Laborers Action, or Consolidated Action."); D.I. 63 (revealing an absence of opposition during oral argument on Plaintiffs' motions).

[73] *See generally* Am. Compl.

Separation, at great cost to New Match. Count I of the operative complaint alleges direct and class claims against Old IAC as Old Match's controller, and Diller as Old IAC's alleged controller, for breach of the duty of loyalty. Count III alleges direct and class breach of fiduciary duty claims against the Director Defendants. Counts II and IV are derivative claims that mirror Counts I and III, respectively.

The bulk of Plaintiffs' allegations focus on the Separation's process. They complain the Separation Committee was supine, acceding to IAC's demands as if the 2015 Agreements made the Separation's terms a foregone conclusion. Plaintiffs contend that the Separation was not subject to those Agreements, and so the Separation Committee should have either (i) pushed back against Old IAC's terms, or (ii) disclosed that it did not because it believed the 2015 Agreements applied. They also assert the Separation Committee agreed to "entrenching" governance provisions to protect New IAC's tax position, not to benefit New Match as defensive anti-takeover measures as the Proxy indicates.[74] At its core, Plaintiffs' theory asserts that because "[t]he Separation was not a Distribution as contemplated by the [2015] Tax Sharing Agreement, . . . [Old] Match was under no obligation to accept the restrictive terms of the [2015] Tax Sharing Agreement covenants."[75] In

---

[74] Am. Compl. ¶¶ 166–68; Proxy at 9, 63–64, 279.

[75] Am. Compl. ¶ 98; *id.* ¶¶ 6, 13, 53, 176.

other words, the Separation Committee could have and should have said "no" to an unfair transaction.[76]

Defendants filed their third round of motions to dismiss (the "Motions") and brief in support thereof on December 10.[77] They challenge Plaintiffs' standing in view of the Separation and Nevada's sale of its stock; assert the Separation is subject to business judgment review; assert the Separation was entirely fair; and assert Plaintiffs did not comply with Rule 23.1. The Director Defendants also argue Plaintiffs have failed to plead non-exculpated claims. Plaintiffs filed their opposition brief on January 25, 2022, and Defendants replied on February 24.[78] The parties presented argument on May 4.[79]

## II. ANALYSIS

The allegations in the Amended Complaint are based, in part, on documents Nevada received in response to its books and records demand pursuant to 8 *Del. C.* § 220.[80]

---

[76] *Id.* ¶ 66.

[77] IAC OB; D.I. 92; MOB.

[78] D.I. 100 [hereinafter "PAB"]; D.I. 105; D.I. 106 [hereinafter "MRB"].

[79] D.I. 117; D.I. 118 [hereinafter "Hr'g Tr."].

[80] Am. Compl. at 1. While Plaintiffs cited to these documents, they did not attach them. *See generally* Am. Compl.; D.I. 100, Transmittal Declaration of Jason W. Rigby in Support of Plaintiffs' Omnibus Answering Brief in Opposition to Defendants' Motions to Dismiss the Amended and Supplemented Verified Consolidated Stockholder Class Action and Derivative Complaint, Ex. 1 ¶ 6. Defendants attached documents produced in response to the books and records demand to their briefs. *See generally* IAC OB. On this basis,

22

The standard for a motion to dismiss under Rule 12(b)(6) for failure to state a claim for relief is well-settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof."[81]

Plaintiffs argue the Motions should be converted to motions for summary judgment. PAB at 29–33; Hr'g Tr. 79–81.

It is common for parties to enter into agreements in connection with a Section 220 production, but "the parties may not rely on private agreement to change the pleading standard at the motion to dismiss stage." *City Pension Fund for Firefighters & Police Officers in the City of Miami v. The Trade Desk, Inc.*, 2022 WL 3009959, at *8–9 (Del. Ch. July 29, 2022) (citing *In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at *14 n.216 (Del. Ch. Oct. 1, 2019)). "The incorporation-by-reference doctrine does not enable a court to weigh evidence on a motion to dismiss. It permits a court to review the actual documents to ensure that the plaintiff has not misrepresented their contents and that any inference the plaintiff seeks to have drawn is a reasonable one." *Voigt v. Metcalf*, 2020 WL 614999, at *9 (Del. Ch. Feb. 10, 2020) (collecting cases). Where a defendant improperly and extensively uses books and records produced to a stockholder pursuant to Section 220 in support of a Rule 12(b)(6) motion to support factual inferences that counter those supported by the complaint, the Court may either exclude the extraneous matter from its consideration or convert the motion into one for summary judgment. *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at *18 (Del. Ch. Jan. 27, 2021), *as corrected* (Feb. 4, 2021). Here, I decline to consider any extraneous documents submitted by Defendants that are not referenced in or integral to the pleadings or otherwise subject to judicial notice.

[81] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted).

Thus, the touchstone "to survive a motion to dismiss is reasonable 'conceivability.'"[82] This standard is "minimal"[83] and plaintiff-friendly.[84] "Indeed, it may, as a factual matter, ultimately prove impossible for the plaintiff to prove [its] claims at a later stage of a proceeding, but that is not the test to survive a motion to dismiss."[85] Despite this forgiving standard, the Court need not accept conclusory allegations unsupported by specific facts or draw unreasonable inferences in favor of the nonmoving party.[86] "Moreover, the court is not required to accept every strained interpretation of the allegations proposed by the plaintiff."[87]

The Court's consideration of Defendants' Motions hinges first on whether Plaintiffs have standing to bring the Amended Complaint's direct and derivative claims. Defendants assert both Plaintiffs lack derivative standing to sue on behalf of Old Match because that entity no longer exists and Plaintiffs cannot satisfy exceptions to the rule that a merger extinguishes standing. Plaintiffs claim they have

---

[82] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536–37 (Del. 2011).

[83] *Id.* at 536.

[84] *E.g.*, *Clouser v. Doherty*, 175 A.3d 86, 2017 WL 3947404, at *9 (Del. 2017) (TABLE); *In re USG Corp. S'holder Litig.*, 2021 WL 930620, at *3–4 (Del. Ch. Mar. 11, 2021); *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *8 (Del. Ch. July 24, 2009).

[85] *Cent. Mortg. Co.*, 27 A.3d at 536.

[86] *E.g.*, *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009) (citations omitted).

[87] *Trados*, 2009 WL 2225958, at *4 (internal quotation marks omitted) (quoting *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006)).

derivative standing on behalf of Old Match because the Separation meets those exceptions. Next, Defendants argue Plaintiffs lack derivative standing to sue on behalf of New Match because they were not New Match stockholders at the time of the alleged wrongdoing. Plaintiffs contend Hallandale has derivative standing as a New Match stockholder because it received its New Match stock by operation of law and it held New Match stock at the time of the Separation. This opinion concludes both stockholders lost standing to assert Old Match derivative claims, and never had standing to assert New Match derivative claims regarding the Separation.

Finally, Defendants argue Nevada lost its direct standing when it sold its New Match stock. Plaintiffs do not argue otherwise.[88] Defendants do not challenge Hallandale's standing to assert direct claims.

As to the merits of Hallandale's direct claim, Plaintiffs allege that the Separation was a conflicted transaction subject to entire fairness review, and that it was the result of an unfair process resulting in an unfair price. Defendants contend the Separation's process was not only rigorous but also cleansing. They argue that the business judgment rule should apply because the Separation followed the *MFW* framework, and Plaintiffs have failed to plead sufficient non-conclusory facts that

---

[88] *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

25

any of the elements of that framework were not satisfied.[89] Alternatively, Defendants argue the Separation was entirely fair. Reading the Amended Complaint in the light most favorable to Plaintiffs, I agree with Defendants that the Separation's process was designed to afford business judgment review, and it succeeded. I do not reach whether Diller is a controller of Old Match. For the reasons that follow, Defendants' Motions are granted.

## A. Nevada Lacks Direct And Derivative Standing, And Hallandale Lacks Derivative Standing.

In this action, Nevada and Hallandale were both appointed as lead plaintiffs.[90] Defendants challenge each plaintiff's standing to assert claims relating to the Separation.[91] Plaintiffs beneficially owned stock in Old Match since October 27, 2017, and in New Match since June 30, 2020. Nevada sold its shares of New Match stock on July 13, 2021, before filing the Amended Complaint.[92]

Standing "refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or redress a grievance."[93] Standing is required to "ensure that the litigation before the tribunal is a 'case or controversy' that is appropriate for the

---

[89] *Kahn v. M & F Worldwide Corp.* (*MFW*), 88 A.3d 635, 645 (Del. Ch. 2014), *overruled on other grounds by Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018).

[90] D.I. 62.

[91] MOB at 51–57; IAC OB at 3, 33; MRB at 22–30.

[92] Am. Compl. ¶ 16; D.I. 76; *see generally* Am. Compl.

[93] *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991) (citation omitted).

exercise of the court's judicial powers."[94]  "[S]tanding is properly a threshold question that the Court may not avoid."[95]  This threshold helps courts "avoid the rendering of advisory opinions at the behest of parties who are mere intermeddlers."[96]

### 1. Plaintiffs' Standing To Bring Derivative Claims On Behalf Of Old Match

Delaware General Corporation Law Section 327 "provides that a stockholder seeking to assert a derivative action on behalf of a corporation must have been a stockholder at the time of the transaction complained of, or his shares must have devolved upon him by operation of law."[97]  For "standing purposes, the 'time of the challenged conduct' is measured by the precise action the plaintiff challenges in the

---

[94] *Dover Hist. Soc'y v. City of Dover Plan. Comm'n*, 838 A.2d 1103, 1110 (Del. 2003).

[95] *Gerber v. EPE Hldgs. LLC*, 2013 WL 209658, at *12 (Del. Ch. Jan. 18, 2013) (citation omitted).

[96] *Ala. By-Prods. Corp. v. Cede & Co. ex rel. Shearson Lehman Bros., Inc.*, 657 A.2d 254, 264 (Del. 1995) (quoting *Stuart Kingston*, 596 A.2d at 1382).

[97] *Ryan v. Gifford*, 918 A.2d 341, 359 (Del. Ch. 2007) (citing 8 *Del. C.* § 327); *see also Bamford v. Penfold, L.P.*, 2020 WL 967942, at *24 n.18 (Del. Ch. Feb. 28, 2020) (discussing Delaware's adoption of the contemporaneous ownership requirement and recognizing that it has been criticized); *Urdan v. WR Cap. P'rs, LLC*, 2019 WL 3891720, at *10 (Del. Ch. Aug. 19, 2019) (discussing the history, origin, and adoption of the contemporaneous ownership requirement in Delaware), *aff'd*, 244 A.3d 668 (Del. 2020); *In re SmileDirectClub, Inc. Deriv. Litig.*, 2021 WL 2182827, at *7 n.51 (Del. Ch. May 28, 2021) (same), *aff'd*, 270 A.3d 239 (Del. 2022); *SDF Funding LLC v. Fry*, 2022 WL 1511594, at *6 & n.23 (Del. Ch. May 13, 2022) (same), *cert. denied*, 2022 WL 2165922 (Del. Ch. June 16, 2022), *appeal refused sub nom. SDF Funding LLC ex rel. Flashpoint Tech., Inc. v. Fry*, 2022 WL 2568076 (Del. July 8, 2022).

complaint."[98] In order to bring a derivative claim a plaintiff "must hold shares not only at the time of the alleged wrong, but continuously thereafter throughout the litigation."[99] "A plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit."[100] The Delaware Supreme Court reaffirmed two exceptions to this rule in *Lewis v. Anderson*: (1) where the merger itself is the subject of a fraud claim, perpetrated to deprive stockholders of their standing to bring or maintain a derivative action; and (2) where the merger is essentially a reorganization that does not affect the

---

[98] *SmileDirectClub*, 2021 WL 2182827, at *8.

[99] *In re Massey Energy Co. Deriv. & Class Action Litig*., 160 A.3d 484, 497–98 (Del. Ch. 2017).

[100] *Lewis v. Anderson*, 477 A.2d 1040, 1049 (Del. 1984); *Lewis v. Ward*, 852 A.2d 896, 901 (Del. 2004) ("When a merger eliminates a plaintiff's shareholder status in a company, it also eliminates her standing to pursue derivative claims on behalf of that company. Those derivative claims pass by operation of law to the surviving corporation, which then has the sole right and standing to prosecute the action.").

stockholder's relative ownership in the post-merger enterprise.[101]    The fraud exception must be alleged with particularity.[102]

Both Plaintiffs lack standing to bring derivative claims on behalf of Old Match. Neither Plaintiff holds shares in Old Match, which ceased to exist as a result of the Separation. The Delaware Supreme Court has repeatedly rejected the argument that Section 327 "preserves" the right for stockholders of a surviving entity to maintain a derivative action on behalf of the company merged out of existence.[103] Plaintiffs could have pursued a pre-Separation derivative claim that satisfied Delaware's continuous and contemporaneous ownership requirements,[104] but they did not.

---

[101] *Anderson*, 477 A.2d at 1046 n.10; *accord Ward*, 852 A.2d at 902; *see also Ark. Tchr. Ret. Sys. v. Caiafa*, 996 A.2d 321, 323 (Del. 2010) (quoting *Ward*, 852 A.2d at 902)); *accord Ark. Tchr. Ret. Sys. v. Countrywide Fin. Corp.*, 75 A.3d 888, 895 (Del. 2013); *cf. Bamford*, 2020 WL 967942, at *29 (Del. Ch. Feb. 28, 2020) ("Although some decisions have interpreted the adverb 'merely' to mean that the exclusive purpose of the transaction must be to deprive stockholders of standing, such a cabined approach would deprive the exception of any efficacy. The exception applies when 'a principal purpose' of the transaction is the elimination of standing to assert derivative claims." (citing *Merritt v. Colonial Foods, Inc.*, 505 A.2d 757, 763 (Del. Ch. 1986), and *Brinckerhoff v. Tex. E. Prod. Pipeline Co., LLC*, 986 A.2d 370, 383 (Del. Ch. 2010))).

[102] *Ward*, 852 A.2d at 905 ("[T]he particularized pleading requirement of Rule 9(b) must be satisfied by a derivative complaint that seeks to invoke the fraud exception in *Lewis v. Anderson*.").

[103] *See, e.g.*, *Anderson*, 477 A.2d at 1048–49.

[104] *See, e.g.*, *In re Inergy L.P.*, 2010 WL 4273197, at *9 (Del. Ch. Oct. 29, 2010) (discussing standards for enjoining a merger); *see also Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 954 A.2d 911, 936 (Del. Ch. 2008) ("[A derivative plaintiff] must move with alacrity to challenge that independent transaction, or it will lose standing." (citation omitted)).

Plaintiffs allege they have standing to assert derivative claims on behalf of Old Match "because the Separation was deliberately structured to eliminate derivative suits,"[105] implicating the first *Anderson* exception. Plaintiffs allege Defendants designed the Separation to terminate Old Match at a time when other derivative litigation was pending against its directors, and to preclude New Match stockholders from bringing a double-derivative action. But Plaintiffs stop short of pleading, as they must, that the "merger itself" was fraudulent and was perpetrated to deprive stockholders of standing.[106] Plaintiffs invoke the purpose of the Separation's structure, but not the purpose of the Separation itself; they do not plead the sole or primary purpose of the Separation was to eliminate stockholders' derivative standing. Indeed, the Amended Complaint specifically pleads that the primary purpose of the Separation was to afford significant monetary benefit to IAC.

> IAC did not give up its majority voting control for no consideration—it transferred its position to its stockholders, got rid of huge amounts of debt, took boat loads of cash and positioned itself to pursue new business opportunities, debt-free with capital extracted from Match. The benefits to IAC were not some side-benefits to a corporate officer worth a few million dollars; *they were the primary purpose of the transactions* and involved billions of dollars.[107]

---

[105] Am. Compl. ¶ 189.

[106] *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 354 (Del. 1988).

[107] Am. Compl. ¶ 11 (emphasis added); *see also id.* ¶ 195 ("The purpose of the Separation was not for Match to alter Match's business enterprise, but as Match and IAC repeatedly recognized in SEC filings and public statements, for IAC to achieve the Separation of IAC's other business from its interest in Match, which was transferred to IAC's stockholders." (emphasis omitted)); *id.* ¶ 199 ("The separation of IAC's businesses from

"[A]voiding derivative liability was neither the only nor the principal reason for supporting the transaction."[108]  And Plaintiffs do not plead fraud at all, much less with the requisite particularity.[109]  Accordingly, Plaintiffs have not pled facts showing the Separation meets the first *Anderson* exception.

Nor have Plaintiffs pled the Separation was a "mere reorganization" of Old Match under *Anderson*'s second exception.  For that exception to apply, a plaintiff must show the transaction "is in reality a reorganization which does not affect plaintiff's ownership of the business enterprise,"[110] or that the "surviving entity is merely the same corporate structure under a new name."[111]  The "mere reorganization" exception does not apply to a transaction that was "the result of a merger of two distinct corporations each of which had separate boards, officers, assets and stockholders."[112]  Here, the Amended Complaint details the differences

---

Match's business, which was the point of the Separation, did not occur until after Hallandale was a stockholder of New Match.  The Proxy and other SEC filings and public statements repeatedly recognized that the separation of the businesses was the purpose of the transaction.").

[108] *Countrywide*, 75 A.3d at 895 (citations and internal quotation marks omitted); *Massey*, 160 A.3d at 498.

[109] *Ward*, 852 A.2d at 905 (citing Ct. Ch. R. 9(b)).

[110] *Id*. at 904 (internal quotation marks omitted) (quoting *Anderson*, 477 A.2d at 1046 n.10, and citing *Kramer*, 546 A.2d at 354).

[111] *Bonime v. Biaggini*, 1984 WL 19830, at *3 (Del. Ch. Dec. 7, 1984), *aff'd*, 505 A.2d 451 (Del. 1985).

[112] *Brokerage Jamie Goldenberg Komen Rev Tru U/A 06/10/08 Jamie L Komen Tr. for Komen v. Breyer*, 2020 WL 3484956, at *15 (Del. Ch. June 26, 2020) (internal quotation

between Old Match and New Match: "[t]he shares that [Old] Match's minority stockholders received in the Separation were in the Old IAC/New Match that was capitalized in a vastly different way from the Old Match,"[113] and "[Old] Match's minority stockholders received New Match shares in a different corporation with limited cash, much higher debt and defensive governance provisions."[114] The Amended Complaint also recognizes that the Separation afforded Old Match's minority stockholders "a slightly higher percentage of ownership of Match" and that the Old Match and New Match boards are different.[115] Indeed, Plaintiffs' theory of wrongdoing is that the Separation left Old Match public stockholders holding equity in a company with different ownership and inferior assets than the company in which they chose to invest. New Match is not merely a reorganized Old Match. The second *Anderson* exception does not apply to the Separation and does not preserve Plaintiffs' derivative standing to bring claims on behalf of Old Match.

---

marks omitted) (quoting *Bonime*, 1984 WL 19830, at *2–3, and citing *Ward*, 852 A.2d at 904, and *Schreiber v. Carney*, 447 A.2d 17, 22 (Del. Ch. 1982)).

[113] Am. Compl. ¶ 10.

[114] *Id.* ¶ 11.

[115] *Id.* ¶ 179; *id.* ¶ 31 ("By ensuring that *almost all* the [Old] Match Board would continue as New Match directors . . . ." (emphasis added)); *compare id.* ¶¶ 22, 29–30 (describing Old Match directors who do not serve on New Match's board), *with id.* ¶¶ 21, 23–28 (identifying director defendants who served on the boards of both Old Match and New Match).

## 2. Plaintiffs' Standing To Bring Derivative Claims On Behalf Of New Match

As for derivative claims on behalf of New Match, stockholders like Hallandale and Nevada that acquired New Match stock only in the June 30, 2020 Separation did not hold New Match stock at the time of the alleged wrongdoing, namely the negotiation of the Separation. Plaintiffs' claims relate to the terms of the Separation, which were negotiated before the Separation. Yet Plaintiffs argue they have standing to bring New Match derivative claims.

First, they argue that their ownership still satisfies Section 327 because the Separation caused them to hold New Match stock by operation of law, i.e. Delaware's merger statute.[116] Not so. "A transfer of shares by operation of law means that the shareholder acquires the shares without any act or cooperation on his or her part."[117] Where a plaintiff acquires its stock by contract, it does not qualify as "operation of law" under Section 327.[118] Delaware law is clear that becoming a

---

[116] PAB at 89–94; Hr'g Tr. 84–87.

[117] *Parfi*, 954 A.2d at 937 (emphasis, internal quotation marks, and brackets omitted) (quoting WILLIAM MEADE FLETCHER, CYCLOPEDIA OF THE LAW OF CORPORATIONS § 5981 (2004)).

[118] *Id.* at 937.

stockholder by merger does not qualify as "by operation of law."[119] Plaintiffs did not acquire their New Match stock by operation of law.[120]

Second, Plaintiffs argue they have standing to assert derivative claims on behalf of New Match because they "became a New Match stockholder before the Separation contemplated by the Transaction Agreement was completed."[121] Plaintiffs plead that they became New Match stockholders on June 30, 2020 "as a result of the Separation" and that the Separation was "consummated" on June 30.[122] They also contend that the Separation "did not occur" until after they became New Match stockholders because, Plaintiffs allege, the Equity Offering was not complete

---

[119] *Ryan*, 918 A.2d at 359 ("He became a shareholder on April 11, 2001, by way of a merger, not by operation of law. Therefore, he lacks standing to assert claims arising before April 11, 2001."); *Komen*, 2020 WL 3484956, at *14 ("Plaintiff concedes, as it must, that it was not a New Fox stockholder at the time of the challenged stock awards and that it became a New Fox stockholder by way of the Transaction and, therefore, not by operation of law. Plaintiff thus does not satisfy the contemporaneous ownership requirement embedded in Section 327." (citations omitted)); *see also Ward*, 852 A.2d at 901 ("When a merger eliminates a plaintiff's shareholder status in a company, it also eliminates her standing to pursue derivative claims on behalf of that company. Those derivative claims pass by operation of law to the surviving corporation, which then has the sole right and standing to prosecute the action.").

[120] Proxy at xxii ("Q: As a[n Old] Match stockholder, what will I own after the completion of the Separation? A: You will receive, through a merger, in exchange for each outstanding share of [Old] Match common stock that you hold: one share of New Match stock . . . ."); *id.* at 140 (explaining Old Match stockholders would receive New Match stock through "a merger of Match with a subsidiary of IAC"); Am. Compl. ¶ 191 (recognizing "Plaintiffs and other stockholders . . . became New Match stockholders as a result of the Merger" between Old Match and the surviving merger subsidiary).

[121] Am. Compl. ¶ 197; *id.* ¶¶ 198–99; PAB at 91–94.

[122] Am. Compl. ¶¶ 154, 182, 191, 197.

34

until July.[123]  According to Plaintiffs, that was the final step of the Separation and "[t]he challenged conduct is not complete until the last corporate action necessary for completion actually takes place, not when the action was authorized."[124]

In support of this contention, Plaintiffs cite *Maclary v. Pleasant Hills, Inc*.[125] *Maclary* is a 1954 case out of this Court determining when 8 *Del. C.* § 327 should be applied.[126]  That case is inapposite.  *Maclary* addresses a narrow exception to be applied sparingly when a plaintiff specifically challenges the mechanics of delayed implementation of a transaction that the board both failed to disclose before the plaintiff became a stockholder, and modified after the plaintiff became a stockholder.[127]  Plaintiffs do not challenge the Separation in such a way. Accordingly, the proper time to assess standing is "when the terms of the transaction

---

[123] *Id.* ¶ 199; PAB at 92.  *But see* Am. Compl. ¶ 151 ("On June 9, 2020, IAC conducted the Equity Offering, selling 17,339,035 shares of New Match common stock at $82.00 per share for net proceeds of $1.4 billion."); IAC/InterActiveCorp, Current Report (Form 8-K) (July 1, 2020) (complying with a June 30, 2020, reporting date for the June 9, 2020 subscription agreements).

[124] PAB at 92.

[125] 109 A.2d 830 (Del. Ch. 1954).

[126] *Maclary v. Pleasant Hills, Inc.*, 109 A.2d 830, 833–34 (Del. Ch. 1954).

[127] *7547 P'rs v. Beck*, 682 A.2d 160, 162 (Del. 1996) ("The Court of Chancery [in the action below] declined to follow *Maclary* after concluding that it was a special case in which a rule was crafted to meet unusual circumstances. We agree that *Maclary* is distinguishable and does not control the result here."); *SmileDirectClub*, 2021 WL 2182827, at *9–10 (declining to apply *Maclary* for the reasons articulated in *Beck*).

are established—not when the transaction is carried out."[128]  As Plaintiffs pled, they became New Match stockholders when the Separation was consummated on June 30, and not before.  Plaintiffs cannot bring New Match derivative claims challenging the Separation.

### 3.   Plaintiffs' Standing To Bring Direct Claims

Standing to assert a direct claim is incident to share ownership, so the right passes with the shares when sold.[129]  Once Nevada sold its New Match stock, it lost standing to assert its direct claims.[130]  Hallandale may maintain its direct claims.

\* \* \* \* \*

For those reasons, all of Nevada's claims and Hallandale's derivative claims are dismissed for lack of standing.[131]  I turn to the merits of Hallandale's direct claims.

---

[128] *In re Nine Sys. Corp. S'holders Litig.*, 2013 WL 771897, at *7 (Del. Ch. Feb. 28, 2013) (citing *Beck*, 682 A.2d at 162–63); *SmileDirectClub*, 2021 WL 2182827, at *8 n.60 (collecting cases).

[129] *See In re Prodigy Commc'ns Corp. S'holders Litig.*, 2002 WL 1767543, at *4 (Del. Ch. July 26, 2002); *In re Phila. Stock Exch.*, 945 A.2d 1123, 1140 & n.31 (Del. 2008).

[130] *Urdan*, 2019 WL 3891720, at *8 ("Having sold all of their shares, they no longer have any interest in the derivative and direct claims that they want to continue litigating.  The dispute has become non-justiciable, and any decision on the merits would be an impermissible advisory opinion.").

[131] Accordingly, there is no need to engage in a demand futility analysis.  *In re AbbVie Inc. S'holder Deriv. Litig.*, 2015 WL 4464505, at *3 n.8 (Del. Ch. July 21, 2015) ("Because I am deciding the pending Motions to Dismiss solely on the standing requirement set forth in 8 *Del. C.* § 327 and implemented by Rule 23.1, as discussed below, I need not reach the demand futility argument and the heightened pleading standard that it entails.").

36

## B.    *MFW* Cleanses Hallandale's Surviving Direct Claims.

Defendants also seek dismissal because the Separation was structured to secure the protections of the business judgment rule. "Whether the plaintiffs' core contention states a claim for breach of fiduciary duty depends on the applicable standard of review."[132]    The parties do not dispute that entire fairness is the presumptive standard of review.[133]

But in *MFW*, the Delaware Supreme Court held that the business judgment rule is the appropriate standard of review for a challenge to a conflicted controller transaction if the transaction satisfies six procedural protections:

> (i) the controller conditions the procession of the transaction on the approval of both a Special Committee and a majority of the minority stockholders; (ii) the Special Committee is independent; (iii) the Special Committee is empowered to freely select its own advisors and say no definitively; (iv) the Special Committee meets its duty of care in negotiating a fair price; (v) the vote of the minority is informed; and (vi) there is no coercion of the minority.[134]

---

[132] *In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *8 (Del. Ch. Oct. 10, 2016) (citing *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997)), *aff'd*, 164 A.3d 56 (Del. 2017) (TABLE); *see also The Trade Desk*, 2022 WL 3009959, at *10.

[133] *E.g.*, IAC OB at 4–5, 23–24, 35, 43, 45, 57–59; PAB at 34; Hr'g Tr. 29.

[134] *Franchi v. Firestone*, 2021 WL 5991886, at *4 (Del. Ch. May 10, 2021) (citing *MFW*, 88 A.3d at 645).

"Whether a transaction complies with the *MFW* framework can be adjudicated at the pleading stage."[135]   Defendants argue the Separation met each of *MFW*'s six elements, and therefore is entitled to business judgment protection.[136]

Here, Hallandale does not dispute the existence of the Separation Committee and an uncoerced majority-of-the-minority vote.  I will focus on *MFW* elements (ii) through (v).  Hallandale argues the Separation Committee was not independent; the Separation Committee was not empowered to freely select its own advisors and definitively say "no"; the Separation Committee did not meet its duty of care; and the minority of Old Match stockholders' vote was not informed.[137]   Accordingly, Hallandale asserts entire fairness is the appropriate standard of review.[138]  I disagree. Interpreting the facts as pled in a light most favorable to Hallandale, the Separation met the elements of *MFW*, and is subject to business judgment protections.[139] Hallandale's direct claim must therefore be dismissed.

---

[135] *In re Dell Techs. Inc. Class V S'holders Litig.*, 2020 WL 3096748, at *15 (Del. Ch. June 11, 2020) (citing *In re Synutra Int'l, Inc. S'holder Litig.*, 2018 WL 705702, at *2 (Del. Ch. Feb. 2, 2018), *aff'd sub nom. Synutra*, 195 A.3d 754)).

[136] *See, e.g.*, MOB at 29–49; IAC OB at 1.

[137] PAB at 35–63.

[138] *Id.* at 63–64.

[139] I pause to note that the Separation, a reverse spinoff collapsing a dual class capital structure and restoring some voting control to the minority, is in many ways the opposite of the freeze-out merger that inspired *MFW*.  *MFW*, 88 A.3d at 639–40.  Hallandale does not dispute that *MFW* measures can restore the Separation to business judgment review. Nor does it appear it could under our jurisprudence as it has developed:  its theory is that a controller extracted benefits by standing on both sides of a transaction, to the detriment of

38

1. **Plaintiffs Have Failed To Plead Facts Making It Reasonably Conceivable That The Separation Committee Lacked Independence.**

Hallandale focuses on the independence of the Separation Committee and asserts none of its three members, McInerney, Seymon, or McDaniel, are independent or disinterested. If the pleadings support a reasonable inference that either (i) 50% or more of the special committee was not disinterested and independent,[140] or (ii) the minority of the special committee "somehow infect[ed]" or "dominate[ed]" the special committee's decisionmaking process,[141] "then the plaintiffs have called into question this aspect of the *MFW* requirements."[142]

---

minority stockholders. *See Berteau v. Glazek*, 2021 WL 2711678, at *13–15 (Del. Ch. June 20, 2021) (explaining "the history of the *MFW* doctrine and what it was intended to address," which began with a squeeze-out merger but has been applied to a variety of controller transactions regardless of the fate of the minority stockholders' interests) (citing *IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *11 (Del. Ch. Dec. 11, 2017) (collecting cases)).

[140] *Dell*, 2020 WL 3096748, at *35 (citing *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1046 n.8 (Del. 2004), and *Beneville v. York*, 769 A.2d 80, 84–87 (Del. Ch. 2000)); *Voigt*, 2020 WL 614999, at *10 (citing *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 24–29 (Del. Ch. 2014)).

[141] *In re GGP, Inc. S'holder Litig.*, 2021 WL 2102326, at *15 (Del. Ch. May 25, 2021), *aff'd in part, rev'd in part, on other grounds, and remanded*, 2022 WL 2815820 (Del. July 19, 2022).

[142] *Dell*, 2020 WL 3096748, at *35.

Plaintiffs point to *Franchi v. Firestone* to support their assertion that a single member of a special committee who is interested or lacking independence, alone, may "call[ *MFW*] into question" for a special committee of more than two directors. Hr'g Tr. 54; PAB at 36–37 (citing *Franchi*, 2021 WL 5991886, at *4, *6). As Defendants' counsel pointed out, the *Franchi* quote on which Plaintiffs rely is a modified quote from *Dell*. Hr'g Tr. 89–90 (comparing *Franchi*, 2021 WL 5991886, at *4 ("If the complaint supports a

Our law presumes directors are independent.[143] "To plead that a director is not independent 'in a manner sufficient to challenge the [*MFW*] framework, a plaintiff must allege facts supporting a reasonable inference that a director is sufficiently loyal to, beholden to, or is otherwise influenced by an interested party so as to undermine the director's ability to judge the matter on its merits.'"[144] Delaware courts have emphasized that director independence must be assessed

reasonable inference that [any] member [of the special committee] was not disinterested and independent, then the plaintiffs have called into question this aspect of the *MFW* requirements."), *with Dell*, 2020 WL 3096748, at *35 ("In this case, the Special Committee had two members. If the complaint supports a reasonable inference that either member was not disinterested and independent, then the plaintiffs have called into question this aspect of the *MFW* requirements." (citing *Beam*, 845 A.2d at 1046 n.8, and *Beneville*, 769 A.2d at 85–87))). In *Dell*, the special committee only had two members, so one lacking independence met the 50% or more threshold to derail *MFW*. *Dell*, 2020 WL 3096748, at *35. In support of this principle, *Dell* relied on *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart* and *Beneville v. York*, each finding that at least half of the directors at issue must lack independence or disinterestedness to poison the committee under *MFW*. *Beam*, 845 A.2d at 1046 n.8 ("If three directors of a six person board are not independent and three directors are independent, there is not a majority of independent directors and demand would be futile."); *Beneville*, 769 A.2d at 84–87 (holding that demand is excused where a board is evenly divided between interested and disinterested directors). In *Voigt v. Metcalf*, this Court similarly found that the business judgment rule would still apply unless the special committee "lacked a disinterested and independent *majority*." 2020 WL 614999, at *10 (Del. Ch. Feb. 10, 2020) (emphasis added) (citing *Orchard*, 88 A.3d at 24–29). The weight of authority requires at least 50% of a special committee to lack independence or disinterestedness before Delaware courts will question the application of *MFW*. A single director will trigger this doubt only if she is one of two, or "infect[ed]" or "dominat[ed]" the committee's decisionmaking. *Dell*, 2020 WL 3096748, at *35; *The Trade Desk*, 2022 WL 3009959, at *13–14 (citing *GGP*, 2021 WL 2102326, at *15).

[143] *Friedman v. Dolan*, 2015 WL 4040806, at *6 (Del. Ch. June 30, 2015).

[144] *Dell*, 2020 WL 3096748, at *35 (alterations in original) (quoting *Books-A-Million*, 2016 WL 5874974, at *9).

holistically, looking at personal and professional ties collectively to determine whether the full constellation of alleged connections between a director and an interested party gives rise to a reasonable doubt about the director's ability to act impartially.[145] To plead a lack of independence, plaintiffs must clear a high bar that goes beyond intersecting social circles,[146] previous business relationships,[147] or both.[148] The relationship between a director and the interested party is a conflict if, for example, the friendship

---

[145] *E.g.*, *Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016).

[146] *E.g.*, *Beam*, 845 A.2d at 1051 ("Allegations that Stewart and the other directors moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as 'friends,' even when coupled with Stewart's 94% voting power, are insufficient, without more, to rebut the presumption of independence.").

[147] *E.g.*, *Orman v. Cullman*, 794 A.2d 5, 27 (Del. Ch. 2002) ("The naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence. The law in Delaware is well-settled on this point.").

[148] *E.g.*, *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 980–81 (Del. Ch. 2000) (finding the plaintiffs' allegation of a fifteen-year "professional and personal relationship" between the director and the controller "alone fails to raise a reasonable doubt" as to the director's independence).

[i]s one where the parties had served as each other's maids of honor, had been each other's college roommates, shared a beach house with their families each summer for a decade, and are as thick as blood relations, that context would be different from parties who occasionally had dinner over the years, go to some of the same parties and gatherings annually, and call themselves "friends."[149]

Delaware "law has recognized that deep and longstanding friendships are meaningful to human beings and that any realistic consideration of the question of independence must give weight to these important relationships and their natural effect on the ability of the parties to act impartially toward each other."[150]

Defendants focus on three cases in which the Delaware Supreme Court found relationships were strong enough to warrant a reasonable inference that the director could not act independent of the interested party: *Marchand v. Barnhill*,[151] *Delaware County Employees Retirement Fund v. Sanchez*,[152] and *Sandys v. Pincus*.[153] In *Marchand*, the Delaware Supreme Court determined, based on the particularized

---

[149] *In re MFW S'holders Litig.*, 67 A.3d 496, 509 n.37 (Del. Ch. 2013), *aff'd sub nom. MFW*, 88 A.3d 635.

[150] *Marchand v. Barnhill*, 212 A.3d 805, 820 (Del. 2019); *see also Orchard*, 88 A.3d at 22 ("A sufficiently close relationship between Donahue and the Samberg family could render him unfit to have served as a member of the Special Committee, much less as its Chair." (citing *In re Loral Space & Commc'ns Inc.*, 2008 WL 4293781, at *20–21 (Del. Ch. Sept. 19, 2008))); *Loral,* 2008 WL 4293781, at *20–21 (treating special committee chairman as conflicted because of his long-standing relationship with controller and his solicitation of an investment from the controller during the special committee negotiations).

[151] 212 A.3d 805 (Del. 2019).

[152] 124 A.3d 1017 (Del. 2015).

[153] 152 A.3d 124, 130 (Del. 2016).

facts in the complaint, that one of the directors at issue could not vote independently.[154]

> [T]he pled facts fairly support the inference that Rankin owes an important debt of gratitude and friendship to the Kruse family for giving him his first job, nurturing his progress from an entry level position to a top manager and director, and honoring him by spearheading a campaign to name a building at an important community institution after him.[155]

In *Sanchez*, the Delaware Supreme Court held a director was not independent for pleading stage purposes because the director had a friendship of over fifty years with an interested party and the director's primary employment was as an executive of a company over which the interested party had substantial influence.[156] The next year, in *Sandys*, the Delaware Supreme Court concluded the fact that the controlling stockholder and one director at issue co-owned an airplane together, and the level of planning that involved, "suggest[ed] that the [relevant] families are extremely close to each other and are among each other's most important and intimate friends."[157] The Court also inferred that it was "suggestive of the type of very close personal

---

[154] *Marchand*, 212 A.3d at 820.

[155] *Id.*

[156] *Sanchez*, 124 A.3d at 1022–23.

[157] *Pincus*, 152 A.3d at 130.

43

relationship that, like family ties, one would expect to heavily influence a human's ability to exercise impartial judgment."[158]

Courts may also consider whether a director has received what can be inferred as material monetary benefits from the conflicted party, such that the court can reasonably infer that the director lacks independence from the hand that feeds her. For example, in *Voigt*, this Court determined "the magnitude of the remuneration [the director in question] has received is sufficiently large to support an inference of materiality at the pleading stage, particularly given the allegation in the complaint that most, if not all, of [the director]'s income has come from entities affiliated with CD&R since her retirement."[159]

### a. Hallandale Has Pled McInerney Was Not Independent From Old IAC, But Not That He Infected Or Dominated The Separation Committee.

With these standards and examples in mind, I start by considering whether McInerney was independent from Old IAC. From January 2003 through December 2005,[160] McInerney served as the CEO of Old IAC's Retailing Division, which

---

[158] *Id.*

[159] *Voigt*, 2020 WL 614999, at *15 (collecting cases).

[160] The Amended Complaint states McInerney "served as the CEO of the Retailing Division of [Old] IAC from January 2003 through December 2005 [and] served as Executive Vice President and CFO of [Old] IAC from January 2005 to March 2012." Am. Compl. ¶ 25; 2019 Form 10-K/A at 5. It is not clear whether these positions overlapped during the year of 2005, whether he transitioned out of his role as CEO of the Retaining Division in

included HSN, Inc.[161]  Next, he served as Old IAC's Executive Vice President and CFO until March 2012.  Hallandale alleges that from 2003 through 2012, McInerney made $55 million in compensation from Old IAC.  McInerney also served on the boards of several Old IAC affiliates:  (i) Interval Leisure Group, Inc. from May 2008 to September 2018; (ii) HSN, Inc. from August 2008 through December 2017; (iii) Old Match from 2015 to June 30, 2020 and the Old Match Separation Committee starting September 18, 2019; and (iv) New Match starting July 1, 2020.  McInerney made over $3 million for his service on the Interval Leisure Group and HSN boards.  He was awarded a $50,000 fee for his service on the Old Match Separation Committee, and $110,000 in cash plus $249,928 in stock awards as a New Match Director.  Hallandale has alleged Old IAC affiliates paid McInerney over $4.5 million in director compensation.  "These fees constituted 73% of the total compensation McInerney received for his service on the boards of directors of public companies."[162]

Defendants argue McInerney's relationship with Old IAC is "stale."[163]  "To the contrary, the history of connections between [Old IAC] and [McInerney]

---

December 2004, or whether he started his role as Executive Vice President and CFO in January 2006.

[161] Am. Compl. ¶¶ 25, 67; 2019 Form 10-K/A at 5.

[162] Am. Compl. ¶ 69.

[163] MRB at 2, 32; Hr'g Tr. 10, 16, 92.

suggests a persistent and ongoing relationship."[164]  Hallandale has alleged

McInerney has worked for either Old IAC or an affiliate as an employee or director

since at least 1999, and continuously since 2003.[165]  Like the relationship in

*Marchand*, McInerney's relationship with Old IAC spanned over twenty years.[166]

And like in *Marchand* and *Sanchez*, McInerney relied on Old IAC, or its affiliates,

as his primary employment for those decades.[167]  During this time, he has made at

least $58 million from his work with Old IAC or Old IAC affiliates.  The facts, as

pled, support an inference of pecuniary materiality at the pleading stage.[168]

Examining the forgoing holistically, I find Hallandale has pled sufficient facts to

support a reasonable inference that McInerney lacks independence from Old IAC.

---

[164] *Voigt*, 2020 WL 614999, at *15.

[165] It is not clear from the complaint whether McInerney, who started at one IAC affiliate in 1999 and was at another in 2003, worked at a non-IAC entity in between.  Am. Compl. ¶ 67.

[166] *Marchand*, 212 A.3d at 808, 819–20 (describing how Rankin worked at the company over thirty years, from 1981 through 2014).  *But see In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 997–98 (Del. Ch. 2014) (director was disinterested despite working with an interested director at another company for eighteen years), *aff'd sub nom. Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).

[167] *Marchand*, 212 A.3d at 808, 820; *Sanchez*, 124 A.3d at 1022–24; *see also Reith v. Lichtenstein*, 2019 WL 2714065, at *15–16 (Del. Ch. June 28, 2019) ("As listed above, Kassan has had numerous roles, including roles such as CEO, President, and CFO that warrant significant compensation, for four entities within the Steel Holdings family. According to public disclosures, as of both December 2017 and March 2019, his 'principal occupation' was working for Steel Services, which is the Steel Holdings affiliate that provides the Company services under the Management Services Agreement.").

[168] *See, e.g.*, *Voigt*, 2020 WL 614999, at *15.

McInerney was only one of the three Separation Committee members. He alone is not the majority. But if he "infect[ed]" or "dominat[ed]" the Separation Committee's decisionmaking process, he alone could disqualify the Separation Committee as an independent and disinterested body.[169] Hallandale alleges McInerney was the lead negotiator on behalf of the Separation Committee.[170] Old IAC's lead negotiator, Joseph Levin, reported to McInerney when McInerney was Old IAC's CFO, before March 2012. Despite this role and that prior relationship, Hallandale does not contend that McInerney dominated the Separation Committee. Hallandale does not allege he controlled the information flow to his fellow directors, undermined the Committee's process, or exerted any undue influence or control over Seymon or McDaniel. Seymon and McDaniel even met with Old IAC's CEO on their own without McInerney "to discuss certain governance-related matters related to New Match."[171] At this stage and based on the record before me, Hallandale has pled no facts making it reasonably conceivable that McInerney's ties to Old IAC "infected" the Separation Committee such that *MFW* could not be satisfied.[172] I must therefore analyze whether it is reasonable to infer that at least one of the other two

---

[169] *The Trade Desk*, 2022 WL 3009959, at *13–14.

[170] Am. Compl. ¶ 70. Hallandale does not dispute that McInerney was not the Separation Committee chair. *See* Hr'g Tr. 90.

[171] Proxy at 149; Am. Compl. ¶ 141.

[172] *See GGP*, 2021 WL 2102326, at *15.

47

Separation Committee members lacked the requisite independence and disinterestedness.

### b. Hallandale Has Not Pled Seymon Lacked Independence.

Next, I consider whether Seymon was an independent member of the Separation Committee. Hallandale contends Seymon lacked independence primarily because of her prior employment at Wachtell. Seymon was an attorney at Wachtell from 1982 through 2011.[173] Hallandale alleges she personally was outside counsel to Old IAC since at least 1994, advised Old IAC in its deals with Ticketmaster and Liberty Media, and testified in this Court in 2008 litigation between Old IAC and Liberty Media.[174] Starting in 2015, after she retired from Wachtell, Seymon served as an Old Match director. On September 18, 2019, she was appointed to the Separation Committee. In July 2020, Seymon began her service on New Match's board, where she also serves on the compensation committee. According to Hallandale, Seymon has received nearly $2 million in cash and stock awards for her service on the Old Match board.

More broadly, Hallandale alleges Wachtell, Seymon's former firm, represented Old IAC in connection with the Old Match IPO, the 2015 Agreements,

---

[173] Am. Compl. ¶¶ 26, 71; 2019 Form 10-K/A at 5.

[174] Am. Compl. ¶¶ 71–75; *see also In re IAC/InterActive Corp.*, 948 A.2d 471, 500–04 (Del. Ch. 2008).

and the Separation.  Hallandale similarly points out that Old IAC's current general counsel used to be an attorney at Wachtell.

As pled, Seymon's relationship with Old IAC and its affiliates is that of an arms' length service provider, and no more.[175]  That relationship is qualitatively different than a relationship with a coworker, employee, or friend.  Hallandale does not allege a friendship between Seymon and anyone, let alone one strong enough to

---

[175] *Compare Parnes v. Bally Ent. Corp.*, 2001 WL 224774, at *10 (Del. Ch. Feb. 23, 2001) (finding, standing alone, a director who was a partner at a law firm that was the defendant company's outside counsel was not enough to disqualify that director as interested), *and Gerber, LLC*, 2013 WL 209658, at *13 n.118 ("Gerber's allegations, as a general matter, suffer because they were not pled with the particularity necessary to rebut the presumption that a director is disinterested and independent.  For example, two of the directors were lawyers who provided legal services to [the controller] or his entities, but no information is provided with respect to whether those services and the income generated from those services were material to the two directors or their firms."), *and Kosseff v. Ciocia*, 2006 WL 2337593, at *6 (Del. Ch. Aug. 3, 2006) (finding that directors who had been a consultant or outside counsel for the company at issue were not per se interested or lacking independence from the company), *with In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *33 (Del. Ch. May 3, 2004) ("Raynor, who was Prosser's long time lawyer, was clearly conflicted.  In 1996, 1997, and 1998, virtually one hundred percent of the legal fees that Raynor generated for his law firm were attributable to work he performed for Prosser and Prosser-owned entities.  Before 1996, the percentage of total fees represented by work Raynor performed for Prosser was always greater than fifty percent.  From 1987 through 1998, ATNI and its affiliates, and thereafter ECM and its affiliates, were the largest single client of Raynor's firm.  In 1998, the year of the Privatization, Raynor became 'of counsel' at his firm and was put on a retainer arrangement wherein ATNCo paid compensation of $25,000 per month to Raynor, and $5,000 per month to his firm, to cover Raynor's office rental cost.  That amount represented all of Raynor's compensation for 1998.  Raynor also served as a Prosser nominee to the ATNI board, and as a director of Innovative, ECM, ATNCo and Vitelco.  As a highly paid consultant to, and later full-time employee of, Prosser and his companies, Raynor was clearly beholden to Prosser and, thus, not independent.").

create interestedness or a lack of independence.[176]   Without more, Hallandale's

allegations of Seymon's prior legal service are insufficient to demonstrate that

Seymon is not an independent member of the Separation Committee.[177]

Hallandale also argues Seymon cannot be independent because of her

husband's employment at Paul, Weiss, Rifkind, Wharton & Garrison LLP, who

served as outside counsel for Old Match.  Hallandale has not pled sufficient facts

---

[176] *Cf. Turner*, 846 A.2d at 980–81 (concluding the plaintiffs' allegation of a "long-standing 15–year professional and personal relationship" between the director and the controller "alone fails to raise a reasonable doubt that [the director] could not exercise his independent business judgment in approving the transaction"); *Beam*, 833 A.2d at 979 ("Not all friendships, or even most of them, rise to [the necessary independence-questioning] level" that "may border on or even exceed familial loyalty and closeness" and "the Court cannot make a *reasonable* inference that a particular friendship does so without specific factual allegations to support such a conclusion").

[177] *Orman*, 794 A.2d at 27 ("The naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence.  The law in Delaware is well-settled on this point.").  *Compare Parnes*, 2001 WL 224774, at *10 ("Parnes challenges the independence of Aronoff by pointing out that Aronoff was a partner in a law firm that was one of Bally's outside counsel.  Parnes has produced no other evidence of a social or business relationship between Aronoff and Goldberg beyond this representation of Bally.  The retention of Aronoff's firm by Bally, absent any evidence that Aronoff's firm was economically or otherwise beholden to Goldberg, is not enough to disqualify Aronoff as interested."), *aff'd*, 788 A.2d 131 (Del. 2001), *with Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *33 (Del. Ch. Apr. 14, 2017) ("Morgan worked for fifteen years as a corporate attorney with the law firm that acts as Oak Hill's long-time outside counsel, he served with Pade on another Board, and his son and Pade's son were friends.  In 2011, Ng received $24 million when Oak Hill purchased a block of his otherwise illiquid stock.  This decision need not consider whether these facts would be sufficient standing alone to call into question either director's motives.  Considered together with the other allegations of the Complaint, these facts support the inference that the outside directors cannot be considered disinterested or independent for purposes of determining the standard of review."), *as corrected* (Apr. 24, 2017).

that her husband's employer's more attenuated business relationship threatens Seymon's independence from IAC and Match.[178]

### c. Hallandale Has Not Pled McDaniel Lacked Independence.

Finally, I consider whether McDaniel was an independent member of the Separation Committee. The Amended Complaint's sole allegation that McDaniel lacked independence is that she was Vice President of Human Resources and later Vice President at GHC while Diller served on the GHC board. Hallandale also alleges Director Defendant Spoon served as GHC's COO, President, and director before McDaniel's tenure. Delaware precedent provides that simultaneous service on the boards of multiple companies, alone, is insufficient to create a reasonable inference of interestedness or a lack of independence.[179] Hallandale has not even alleged simultaneous board service. McDaniel's employment overlapping with Diller and an IAC board member's board service at a different entity does not support a reasonable inference that McDaniel could not serve as an independent member of the Separation Committee.[180]

---

[178] *See Kosseff*, 2006 WL 2337593, at *6.

[179] *Parnes*, 2001 WL 224774, at *10.

[180] *Orman*, 794 A.2d at 27–29.

51

For the reasons stated above, I conclude that Hallandale failed to plead a reasonably conceivable set of facts showing that a majority of the Separation Committee lacked independence.

### 2. Hallandale Pled The Separation Committee Was Sufficiently Empowered.

The third *MFW* element hinges on what the Separation Committee was empowered to do. Considering the parties' arguments and the facts as pled in a light most favorable to Hallandale, I conclude Hallandale failed to plead the Separation Committee was not sufficiently empowered. The Separation Committee was "empowered to freely select its own advisors," and empowered to "say no definitively."[181]

### a. The Separation Committee Was Empowered To Freely Select Its Own Advisors.

"The effectiveness of a Special Committee often lies in the quality of the advice its members receive from their legal and financial advisors."[182] "As has been

---

[181] *Franchi*, 2021 WL 5991886, at *4 (citing *MFW*, 88 A.3d at 645); *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1146 (Del. Ch. 2006) ("In addition to being independent and, preferably, having more than one member, a well constituted special committee should be given a clear mandate setting out its powers and responsibilities in negotiating the interested transaction. Evidently, this mandate should include the power to fully evaluate the transaction at issue, and, ideally, include what this court has called the "critical power" to say 'no' to the transaction." (citations omitted)).

[182] *See, e.g.*, *In re Tele-Commc'ns, Inc. S'holders Litig.*, 2005 WL 3642727 at *10 (Del. Ch. Dec. 21, 2005) (citing William T. Allen, *Independent Directors in MBO Transactions: Are They Fact or Fancy?*, 45 BUS. LAW. 2055, 2056 (1990)).

repeatedly held, special committee members should have access to knowledgeable and independent advisors, including legal and financial advisors."[183] In this context, "independent" means that the advisors work for the special committee and have the committee's interests in mind.[184] Independence requires not being chosen by the controller,[185] being "co-opt[ed]" by the controller,[186] or harboring "powerfully conflicting incentives."[187]

It remains undisputed that the Separation Committee independently retained its own financial and legal advisors—Goldman Sachs and Debevoise.[188] J.P. Morgan Securities LLC ("J.P. Morgan") and Wachtell represented Old IAC.[189]

---

[183] *Gesoff*, 902 A.2d at 1147 (citing *In Tele–Commc'ns*, 2005 WL 3642727, at *10).

[184] *See, e.g.*, *In re Tele–Commc'ns*, 2005 WL 3642727 at *10 ("Rather than retain separate legal and financial advisors, the Special Committee chose to use the legal and financial advisors already advising TCI. This alone raises questions regarding the quality and independence of the counsel and advice received.").

[185] *See, e.g.*, *Gesoff*, 902 A.2d at 1138–39, 1150–51 (finding "[e]ven if Simon had clearly been granted the power to say 'no,'" the special committee did not freely select its own advisors, and thus *MFW* did not apply, where controller "handpicked" the special committee's financial advisor).

[186] *Emerging Commc'ns*, 2004 WL 1305745, at *37 ("Also not disclosed was the related fact that ECM's and the Committee's original advisors who had been retained to represent the interests of all shareholders in the initially Proposed (but later abandoned) Merger, had been co-opted by Prosser and were now working against the minority stockholders whose interests that they were originally hired to further.").

[187] *In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54, 94–95 (Del. Ch. 2014) (finding the special committee's financial advisor had "powerfully conflicting incentives" including contingent compensation arrangement and its offer of financing to potential buyers of company it was advising).

[188] Am. Compl. ¶¶ 78, 84–85, 122; Proxy at 142.

[189] Am. Compl. ¶¶ 85, 143; Proxy at 139.

Hallandale has not alleged that Old IAC selected Goldman Sachs on the Separation Committee's behalf or that Goldman Sachs was already representing Old Match in connection with the Separation.[190] The Separation Committee considered three potential financial advisors. After meeting with the candidates, and considering each with its counsel, the Separation Committee retained Goldman Sachs.[191] Drawing all reasonable inferences in Hallandale's favor, the Separation Committee was empowered to freely select its own advisors.

Hallandale points out that some members of Goldman Sachs's Match team were on an Investment Banking Division team "serving [Old] IAC and Match,"[192] but the disclosure letter specified the Investment Banking Division provided IAC with underwriting services to two relatively small transactions in April 2019 and May 2017.[193] Hallandale has offered no basis to conclude Goldman Sachs was "powerfully conflicted" in favor of IAC.[194]

---

[190] *See Gesoff*, 902 A.2d at 1138, 1150–51; *In re Tele-Commc'ns*, 2005 WL 3642727, at *10.

[191] Am. Compl. ¶¶ 78–79, 84, 122; Proxy at 142, 146.

[192] Disclosure Letter at MATCH-0001893; *see supra* note 38 (explaining why the Disclosure Letter is properly considered on the pending motions).

[193] *Id.* at MATCH-0001891.

[194] *See Rural Metro*, 88 A.3d at 94–95.

Hallandale questions the Separation Committee's decision to retain Goldman Sachs given its position on some of the Exchangeables. I address the propriety of that decision below, in connection with considering whether the Separation Committee fulfilled its mandate with due care.

### b. Hallandale Specifically Pled The Separation Committee Was Empowered To Say "No."

"The power to say no is a significant power."[195]  As this Court has explained:

> The only leverage that a special committee may have where a fiduciary's position precludes alternatives (such as . . . where a controlling shareholder owns a majority of voting power) is the power to say no and, thus, to force the fiduciary to choose among the options of implementing a frank self-dealing transaction at a price that knowledgeable directors have disapproved, to improve the terms of the transaction or abandon the transaction.[196]

It must be apparent from the inception of negotiations that the controlling stockholder "cannot bypass the special committee's ability to say no."[197]  The power to say "no" is blunted if the special committee does not have accurate information,[198] if the committee is facing an ultimatum from the controller,[199] or otherwise

---

[195] *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1119 (Del. 1994) (citations and internal quotation marks omitted).

[196] *In re First Bos., Inc. S'holders Litig.*, 1990 WL 78836, at *7 (Del. Ch. June 7, 1990).

[197] *See Salladay v. Lev*, 2020 WL 954032, at *10 (Del. Ch. Feb. 27, 2020) (internal quotation marks omitted) (quoting *MFW*, 88 A.3d at 644).

[198] *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *2 (Del. Ch. Aug. 27, 2015) ("Critically for purposes of the outcome of this litigation, the Committee never obtained accurate information about Dole's ability to improve its income by cutting costs and acquiring farms.  By taking these actions, Murdock and Carter deprived the Committee of the ability to negotiate on a fully informed basis and potentially say no to the Merger.").

[199] *Lynch*, 638 A.2d at 1120 (discussing controller-issued ultimatums as impeding the special committee's ability to say no (citing *Am. Gen. Corp. v. Tex. Air Corp.*, 1987 WL 6337, at *4 (Del. Ch. Feb. 5, 1987))); *Dell*, 2020 WL 3096748, at *16 (Del. Ch. June 11, 2020) (same).

threatened.[200] Special committee members have a duty to use their ability to say "no" to achieve a transaction in the best interests of the minority stockholders.[201]

Hallandale specifically pled the Separation Committee had the ability to say "no."[202] The 2015 Tax Sharing Agreement and 2015 Investor Rights Agreement obliged Old Match to "reasonably" go along with Old IAC in the event of an applicable transaction. Such agreements can complicate saying "no."[203] But Hallandale specifically and clearly pled that the Separation is not a "Distribution," is not covered by the 2015 Tax Sharing Agreement, and did not limit the Separation

---

[200] *See In re Rouse Props., Inc.*, 2018 WL 1226015, at *16 (Del. Ch. Mar. 9, 2018) ("There were no strong-arm tactics, no threats of a hostile tender offer, no attempts to block the Committee from hiring advisors, no suggestions that the Committee's pursuit of its broad mandate (including to say no or pursue other strategic alternatives) would provoke a response from Brookfield . . . .").

[201] *First Bos.*, 1990 WL 78836, at *7.

[202] Am. Compl. ¶ 66 ("Notwithstanding its authority to say 'no,' the Separation Committee barely considered this power.").

[203] One can imagine circumstances where a special committee faces a "strong arm tactic," such as the threat of a lawsuit for breach of contract, as a response to saying "no." *See Rouse*, 2018 WL 1226015, at *16 ("There were no strong-arm tactics, no threats of a hostile tender offer, no attempts to block the Committee from hiring advisors, no suggestions that the Committee's pursuit of its broad mandate (including to say no or pursue other strategic alternatives) would provoke a response from Brookfield . . . ."); *Frederick Hsu*, 2017 WL 1437308, at *23–24 ("It is true that the fiduciary status of directors does not give them Houdini-like powers to escape from valid contracts. . . . But the fact that a corporation is bound by its valid contractual obligations does not mean that a board does not owe fiduciary duties when considering how to handle those contractual obligations; it rather means that the directors must evaluate the corporation's alternatives in a world where the contract is binding. Even with an iron-clad contractual obligation, there remains room for fiduciary discretion because of the doctrine of efficient breach."). Hallandale does not press that any such threat neutralized the Separation Committee.

Committee's power to say "no" to the Separation it was formed to consider.[204] Not surprisingly, Defendants agree that the Separation Committee was empowered to say "no," notwithstanding any contractual obligations.[205]

Hallandale argues the Separation Committee failed to use its leverage to decline the structure to negotiate better terms against Old IAC. This goes to the quality of the Separation Committee's work, not whether it was adequately empowered. Taking Hallandale's allegations as pled, the Separation Committee was empowered to say "no."

### 3. Hallandale Fails To Plead The Separation Committee Did Not Meet Its Duty Of Care.

"[T]he entire point of the *MFW* standard is to recognize the utility to stockholders of replicating the two key protections that exist in a third-party merger: an independent negotiating agent whose work is subject to stockholder approval."[206] To demonstrate that the cleansing effect of *MFW* does not apply because the independent committee failed to exercise its duty of care, a plaintiff must plead that the committee acted with gross negligence.[207] "Gross negligence involves more than

---

[204] Am. Compl. ¶¶ 6–7, 13–14, 53, 65–66, 98, 161, 176; Hr'g Tr. 68–72, 74, 76–77, 79.

[205] Hr'g Tr. 24–27, 79.

[206] *In re AmTrust Fin. Servs., Inc. S'holder Litig.*, 2020 WL 914563, at *9 (Del. Ch. Feb. 26, 2020) (emphasis and internal quotation marks omitted) (quoting *Synutra Int'l, Inc.*, 195 A.3d at 766–67).

[207] *Franchi*, 2021 WL 5991886, at *6; *accord Synutra*, 195 A.3d at 768 ("This Court affirmed that holding, eliminating any ambiguity created by *MFW* and confirming that a

simple carelessness.  To plead gross negligence, a plaintiff must allege 'conduct that constitutes reckless indifference or actions that are without the bounds of reason.'"[208] Simply "disagree[ing] with the [special] committee's strategy is not a duty of care violation."[209]  Neither is "questioning the sufficiency of the price."[210]  The focus of the Court's duty of care inquiry is on process, not price.[211]  "A committee can satisfy its duty of care by negotiating diligently with the assistance of advisors."[212]

Hallandale's allegations center on three areas:  the Separation Committee acted with a "controlled mindset" and fell short of Hallandale's expectations in

---

plaintiff can plead a duty of care violation only by showing that the Special Committee acted with gross negligence, not by questioning the sufficiency of the price.").

[208] *Morrison v. Berry*, 2019 WL 7369431, at \*22 (Del. Ch. Dec. 31, 2019) (quoting *Zucker v. Hassell*, 2016 WL 7011351, at \*7 (Del. Ch. Nov. 30, 2016)).

[209] *Synutra*, 195 A.3d at 768 (Del. 2018) (internal quotation marks omitted) (quoting *Swomley v. Schlecht*, 2014 WL 4470947, at \*21 (Del. Ch. Aug. 27, 2014) (TRANSCRIPT), *aff'd* 128 A.3d 992 (Del. 2015) (TABLE)); *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) ("Directors' decisions must be reasonable, not perfect. 'In the transactional context, [an] extreme set of facts [is] required to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties.'" (alterations in original) (footnote omitted) (citing *Paramount Commc'ns, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 45 (Del. 1994), and quoting *In re Lear Corp. S'holder Litig.*, 2008 WL 4053221 at \*11 (Del. Ch. Sept. 2, 2008))).

[210] *Franchi*, 2021 WL 5991886, at \*6 (internal quotation marks omitted) (quoting *Synutra*, 195 A.3d at 768); *id.* ("Plaintiffs' contentions concerning a 'windfall' to Icahn amount to mere questioning of the deal price, which is not enough to establish gross negligence.").

[211] *AmTrust*, 2020 WL 914563, at \*9 ("In *Flood v. Synutra International, Inc.*, our Supreme Court addressed some 'confusing dicta in *MFW*' to clarify that the focus of the inquiry is on process, not price." (quoting *Synutra*, 195 A.3d at 767)).

[212] *Books-A-Million*, 2016 WL 5874974, at \*18 (citing *In re MFW S'holders Litig.*, 67 A.3d at 514–16).

negotiations; the Separation Committee hired a conflicted financial advisor;[213] and the Separation Committee "structured the Separation to involve a merger that Defendants believe extinguished derivative claims."[214] For the reasons explained below, the allegations against the Separation Committee do not successfully plead a breach of its duty of care.

First, Hallandale argues the Separation Committee acted with a "controlled mindset."[215] In support of this assertion, Hallandale lists nearly a dozen terms, issues, and personnel that, according to Hallandale, the Separation Committee either agreed to too quickly or not quickly enough.[216] These are disagreements with the Separation Committee's strategy and not examples of "reckless indifference or

---

[213] Hallandale primarily raised Goldman Sachs's independence as a collateral attack on *MFW*'s applicability, raising it only cursorily under the duty of care prong. PAB at 51–52, 54–55. Hallandale did not raise it as a disclosure issue. PAB at 55–63. This opinion considers the wisdom of the committee's empowered and independent selection of a conflicted advisor as a care claim. *Cf. RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816 (Del. 2015) (finding an underlying duty of care violation by the board in relying on a conflicted financial advisor to support an aiding and abetting claim against the financial advisor); *id.* at 855 ("While a board may be free to consent to certain conflicts, and has the protections of 8 *Del. C.* § 141(e), directors need to be active and reasonably informed when overseeing the sale process, including identifying and responding to actual or potential conflicts of interest.").

[214] PAB at 54.

[215] *Id.* at 48–52, 54–55.

[216] *Id.* at 49–51.

actions that are without the bounds of reason."[217]  The Separation Committee met at least twenty times, consulted with its own legal and financial advisors, considered the implications of saying "no" to the Separation, and successfully negotiated benefits for the minority not included in Old IAC's initial proposal.[218]  These concessions include favorable adjustments to Old IAC's reclassification exchange ratio; a 57.5% reduction of Old IAC's dividend request; and Old IAC's commitment to bear 40% of the cost of New Match options.  Merely because the Separation Committee recommended that the Board and stockholders vote to approve the Separation does not render the Separation Committee controlled.[219]  At bottom, Hallandale's challenge to the Separation Committee is grounded in Hallandale's belief that the Separation was a bad deal for Old Match stockholders: "[b]ut the Delaware Supreme Court has clarified that this court's role in applying the *MFW* framework is limited to a process analysis, not second guessing the ultimate 'give' and 'get.'"[220]  It is not reasonably conceivable that the Separation Committee acted with a "controlled mindset."[221]

---

[217] *Franchi*, 2021 WL 5991886, at *6 (quotation marks omitted) (quoting *Synutra*, 195 A.3d at 768); *Morrison*, 2019 WL 7369431, at *22 (quoting *Zucker*, 2016 WL 7011351, at *7).

[218] Am. Compl. ¶¶ 85–86, 89, 94, 99, 101–02, 106, 109–14, 118, 121, 123–24, 129–34, 137–38, 141–45, 147, 164, 179; Proxy at 142–52, 157–61.

[219] *See The Trade Desk*, 2022 WL 3009959, at *15.

[220] *Id.* (citing *Synutra*, 195 A.3d at 756).

[221] *Franchi*, 2021 WL 5991886, at *6.

Second, Hallandale suggests the Separation Committee's choice to hire Goldman Sachs as its financial advisor amounts to gross negligence.[222] Hallandale argues the Separation Committee "suffered from a glaring flaw" because it "knowingly engaged a conflicted advisor."[223] Hallandale alleges Goldman Sachs "was conflicted in that it [was] a counterparty on the call spreads underlying certain of the exchangeable notes that [New] Match assumed in the Separation" and because members of the Old Match Separation team were members of Goldman Sachs's Investment Banking Division team "serving [Old] IAC and [Old] Match" by providing underwriting services.[224] By letter and in at least two meetings, Goldman Sachs disclosed those conflicts to the Separation Committee and Debevoise.[225] After consideration and discussion with Debevoise, the Separation Committee retained Goldman Sachs as its financial advisor.[226]

Special committees should have access to knowledgeable and independent legal and financial advisors.[227] As observed in *In re Rural Metro Corporation Stockholders Litigation*:

---

[222] PAB at 54–55.

[223] *Id.* at 52.

[224] Am. Compl. ¶¶ 12, 83 (emphasis omitted); *see also id.* ¶¶ 78–84.

[225] *Id.* ¶¶ 78–83; Proxy at 142; *see generally* Disclosure Letter; *see supra* note 38 (explaining why the letter is properly considered on the pending motions).

[226] *See* Am. Compl. ¶¶ 78–84; Proxy at 142, 146.

[227] *Gesoff*, 902 A.2d at 1147 (citing *Tele-Commc'ns*, 2005 WL 3642727, at *10).

> [P]art of providing active and direct oversight is acting reasonably to learn about actual and potential conflicts faced by directors, management, and their advisors. . . . Because of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives, directors must act reasonably to identify and consider the implications of the investment banker's compensation structure, relationships, and potential conflicts.[228]

There may be some conflicts a special committee cannot consent to in discharging their fiduciary duties.[229] But boards and committees can reasonably consent to some financial advisor conflicts without violating their duty of care.[230] This Court has held that a special committee hiring a conflicted financial advisor is not, per se, grossly negligent.[231] "Rather, the Court can take [the alleged conflict] into consideration in determining whether the financial advisor failed to assist the

---

[228] *Rural Metro*, 88 A.3d at 90 (citations omitted).

[229] *In re Zale Corp. S'holders Litig.*, 2015 WL 5853693, at *20 (Del. Ch. Oct. 1, 2015) (citing William W. Bratton & Michael L. Wachter, *Bankers and Chancellors,* 93 TEX. L. REV. 1, 44, 56–61 (2014)), *opinion amended on reargument*, 2015 WL 6551418 (Del. Ch. Oct. 29, 2015).

[230] *See, e.g.*, *In re Smurfit-Stone Container Corp. S'holder Litig.*, 2011 WL 2028076, at *23–24 (Del. Ch. May 20, 2011) ("[T]he Special Committee's decision to retain and rely upon the work of Lazard [even though Lazard had a contingency fee] was not unreasonable and, as such, is not likely to provide a predicate for a violation of its members' fiduciary duties."), *as revised* (May 24, 2011); *Rouse*, 2018 WL 1226015, at *24 (applying the business judgment rule where the special committee determined Bank of America could serve as its financial advisor in spite of it providing "investment banking, commercial banking and other financial services" to the merger counterparty); *see also In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 734–37, 746–49 (Del. Ch. 2016) (dismissing an aiding and abetting count against Goldman Sachs for want of an underlying breach of fiduciary duty by the special committee, where the special committee and its counsel determined Goldman Sachs could serve as the company's financial advisor in spite of its financial interest in the call spread transactions).

[231] *See, e.g.*, *Smurfit-Stone*, 2011 WL 2028076, at *23.

committee in maximizing stockholder value or whether the committee failed to oversee adequately the advisor's work."[232] A financial advisor's independence turns on whether its interest in the transaction is material, and if so, whether that interest was quantifiable.[233]

Hallandale cites *In re Tele-Communications, Inc. Shareholders Litigation* for the proposition that the Court can "question[] the effectiveness of a committee that knowingly chose a conflicted financial advisor."[234] *Tele-Communications* is distinguishable. There, the Court considered the committee's choice of advisors in an entire fairness analysis when "[r]ather than retain separate legal and financial advisors, the Special Committee chose to use the legal and financial advisors already advising [the company]."[235]

But here, Old IAC retained J.P. Morgan as its financial advisor; Goldman Sachs was not advising both sides of the deal.[236] And the Proxy disclosed Goldman Sachs's conflicts and the Separation Committee's subsequent considerations and

---

[232] *Id.*

[233] *David P. Simonetti Rollover IRA v. Margolis*, 2008 WL 5048692, at *8 (Del. Ch. June 27, 2008); *Harcum v. Lovoi*, 2022 WL 29695, at *21 (Del. Ch. Jan. 3, 2022) ("Although advisor conflicts should be disclosed, a plaintiff must provide sufficient facts to establish that the conflict or potential conflict was material." (footnote omitted)).

[234] PAB at 52 n.203 (citing *In re Tele-Commc'ns*, 2005 WL 3642727, at *10).

[235] *In re Tele-Commc'ns*, 2005 WL 3642727, at *10.

[236] Proxy at 139; *see also* Am. Compl. ¶ 143.

conclusions.[237]   Hallandale failed to offer any allegations to support a reasonable inference that Goldman Sachs's employees' past underwriting "serv[ice]" to Old IAC had any effect on its advice to the Separation Committee or the Separation Committee's decision to recommend the Separation to Old Match's Board.  Without more, that past work and Goldman Sachs's disclosed position on the Exchangeables do not support a reasonable inference of a material conflict that renders the Separation Committee grossly negligent in hiring Goldman Sachs.[238]   At bottom, Hallandale has failed to allege that Goldman Sachs failed or betrayed the Separation Committee in any way, or that the Separation Committee would reasonably have expected them to do so at the time of hiring. The pleadings do not support a reasonable inference that hiring Goldman Sachs was grossly negligent and a violation of the Separation Committee's duty of care.

---

[237] Proxy at 142–46.

[238] *See In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2011 WL 227634, at *6 (Del. Ch. Jan. 14, 2011) ("[P]laintiffs presented no evidence that [the special committee's legal advisor's] representation of iStar had any [e]ffect on [the legal advisor's] advice to the Special Committee or had any [e]ffect on the Special Committee's decision to approve the Merger . . . .  Thus, I conclude that this alleged conflict was not material and did not need to be disclosed."), *judgment entered*, (Del. Ch. 2011); *In re Zale Corp. S'holders Litig.*, 2015 WL 6551418, at *5 (Del. Ch. Oct. 29, 2015) (finding the director defendants exercised their duty of care and did not act with gross negligence "when they first engaged Merrill Lynch" as their financial advisor).

Finally, as explained above, the sole purpose of the Separation's structure was not to extinguish derivative standing. Hallandale pled as much.[239] Hallandale's contentions challenging the Separation Committee's decision to agree to the Separation's structure amount to disagreeing with the Separation Committee's strategy and not "reckless indifference" or unreasonable acts.[240] Accordingly, Hallandale has failed to plead that the Separation Committee acted with gross negligence in violation of its duty of care.

### 4. Old Match's Minority Stockholders Were Fully Informed.

I turn now from the Separation Committee to *MFW*'s other protective aspect: an uncoerced and informed vote by a majority of the minority. Hallandale challenges only whether the vote was informed. In evaluating whether stockholders were fully informed, the Court must consider "whether the Company's disclosures apprised stockholders of all material information and did not materially mislead them."[241] "At the pleading stage, that requires [the Court] to consider whether [a] [p]laintiff's complaint, when fairly read, supports a rational inference that material facts were not disclosed or that the disclosed information was otherwise materially

---

[239] *See supra* note 107.

[240] *Synutra*, 195 A.3d at 767–68 (quoting *Swomley*, 2014 WL 4470947, at *21).

[241] *Morrison*, 191 A.3d at 282 (citing *Appel v. Berkman*, 180 A.3d 1055, 1057 (Del. 2018)).

misleading."[242]  This inquiry is necessarily "fact-intensive, and the Court should

deny a motion to dismiss when developing the factual record may be necessary to

make a materiality determination as a matter of law."[243]

The Delaware Supreme Court described the materiality standard in *Morrison*

*v. Berry*:

> An omitted fact is material if there is a substantial likelihood that a
> reasonable shareholder would consider it important in deciding how to
> vote.  Framed differently, an omitted fact is material if there is "a
> substantial likelihood that the disclosure of the omitted fact would have
> been viewed by the reasonable investor as having significantly altered
> the total mix of information made available."  But, to be sure, this
> materiality test "does not require proof of a substantial likelihood that
> disclosure of the omitted fact would have caused the reasonable
> investor to change his vote."[244]

---

[242] *Id.* at 282 (citing *Berkman*, 180 A.3d at 1064).

[243] *Chester Cnty. Emps.' Ret. Fund v. KCG Hldgs., Inc.*, 2019 WL 2564093, at *10 (Del. Ch. June 21, 2019) (compiling sources).

[244] 191 A.3d at 282–83 (footnotes omitted) (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)); *accord TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) ("An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. . . .  It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote.  What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.  Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.").

"Just as disclosures cannot omit material information, disclosures cannot be materially misleading."[245] The *Morrison* Court explained the standard for evaluating whether partial disclosures are materially misleading:

> As we said in *Arnold v. Society for Savings Bancorp, Inc.*, "once defendants traveled down the road of partial disclosure of the history leading up to the Merger . . . they had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events." And, in *Zirn v. VLI Corp.*, we explained that, "even a non-material fact can, in some instances, trigger an obligation to disclose additional, otherwise non-material facts in order to prevent the initial disclosure from materially misleading the stockholders."[246]

To be sure, facts are not necessarily material simply because a stockholder may find them "helpful."[247] Delaware courts are cautious in "balancing the benefits of additional disclosures against the risk that insignificant information may dilute potentially valuable information."[248]

---

[245] *Morrison*, 191 A.3d at 283.

[246] *Id.* (alterations in original) (footnotes removed) (quoting *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1280 (Del. 1994), and then quoting *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996)).

[247] *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *10 (Del. Ch. June 30, 2014) ("Delaware law does not require information to be disclosed simply because that information might be helpful." (internal quotation marks omitted) (quoting *Skeen v. Jo–Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000))).

[248] *Volcano*, 143 A.3d at 734–37, 749 (citing *Solomon v. Armstrong*, 747 A.2d 1098, 1128 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000) (TABLE)).

> Counterbalancing the mandate for complete disclosure, of course, is recognition of the risk of inundating the stockholder with so much information that the proxy clouds, rather than clarifies, the stockholder's decision. A complaint does not state a disclosure violation by noting picayune lacunae or "tell-me-more" details left out.[249]

"Redundant facts, insignificant details, or reasonable assumptions need not be disclosed. Nor must information be disclosed simply because a plaintiff alleges it would be helpful, or interesting."[250] "The question of materiality is a 'context-specific inquiry.' 'So long as the proxy statement, viewed in its entirety, sufficiently discloses and explains the matter to be voted on, the omission or inclusion of a particular fact is generally left to management's business judgment.'"[251] Hallandale alleges four categories of disclosure problems that, in its view, preclude *MFW*'s application to the Separation. I address each in turn.

First, Hallandale contends that "the Proxy fails to disclose the Separation Committee's disabling conflicts with respect to Diller and IAC, particularly the deep and decades-long professional and financial ties of McInerney and Seymon to Diller

---

[249] *Salladay*, 2020 WL 954032, at *12 (footnote omitted) (compiling sources).

[250] *In re Merge Healthcare Inc.*, 2017 WL 395981, at *9 (Del. Ch. Jan. 30, 2017) (footnote omitted) (citing *Abrons v. Maree*, 911 A.2d 805, 813 (Del. Ch. 2006), and *Dent*, 2014 WL 2931180, at *10).

[251] *The Trade Desk*, 2022 WL 3009959, at *16 (citations omitted) (quoting *Dell*, 2020 WL 3096748, at *39, and then quoting *In re 3Com S'holders Litig.*, 2009 WL 5173804, at *1 (Del. Ch. Dec. 18, 2009)).

and IAC."[252]  As explained above, because Hallandale failed to allege Seymon and McDaniel were conflicted, "disclosures related to [their] supposed conflicts are immaterial."[253]

As for McInerney, the Proxy incorporates Old Match's 2019 Form 10-K and 2019 Form 10-K/A.[254]  The 2019 10-K/A discloses McInerney's work history and board service dating back to 1986:

---

[252] Am. Compl. ¶ 173.

[253] *Franchi*, 2021 WL 5991886, at *6 (citing *Orman*, 794 A.2d at 33–34); *Orman*, 794 A.2d at 33–34 (holding that failure to disclose "nonexistent interest or lack of independence" was not a material disclosure violation).

[254] Proxy at 1–2, 19, 308–09.  It is not a per se disclosure violation to disclose information in public filings incorporated in the proxy instead of the proxy itself.  *Galindo v. Stover*, 2022 WL 226848, at *9 (Del. Ch. Jan. 26, 2022) ("The Merger Proxy also incorporates by reference the Form 10-Q, which had attached the Amended Plan previously.  Between these references and the availability of the actual Amended Plan, the pertinent information about the Amended Plan was accessible to Noble stockholders." (footnote omitted)); *id.* at *10 ("[M]ere failure to organize the documents to meet [the] plaintiff's best case scenario for maximizing the clarity of the information presented does not constitute the kind of omission or misleading half truth necessary for a materially inadequate disclosure." (alteration in original) (internal quotation marks omitted) (quoting *Salladay*, 2020 WL 954032, at *16)); *Wolf v. Assaf*, 1998 WL 326662, at *3 (Del. Ch. June 16, 1998) ("Under no reasonable interpretation of the facts plead [sic] could the placement of the disclosure about the [allegedly omitted information] in the 10-K accompanying the proxy statement rather than in the statement itself serve as the basis for a disclosure violation.").

Thomas J. McInerney, age 55, has been a director of Match Group since November 2015. Mr. McInerney has served as Chief Executive Officer of Altaba Inc., a publicly traded registered investment company and the successor company to Yahoo! Inc., since June 2017. Mr. McInerney previously served as Executive Vice President and Chief Financial Officer of IAC from January 2005 to March 2012. From January 2003 through December 2005, he served as Chief Executive Officer of the retailing division of IAC, which included HSN, Inc. and Cornerstone Brands. From May 1999 to January 2003, Mr. McInerney served as Executive Vice President and Chief Financial Officer of Ticketmaster, formerly Ticketmaster Online-CitySearch, Inc., a live entertainment ticketing and marketing company. From 1986 to 1988 and from 1990 to 1999, Mr. McInerney worked at Morgan Stanley, a global financial services firm, most recently as Principal. Mr. McInerney has served on the board of directors of Altaba Inc. since June 2017. During the past five years, Mr. McInerney served on the boards of Yahoo! Inc., HSN, Inc., Cardlytics, Inc., and Interval Leisure Group. In determining that Mr. McInerney should serve as a director, the Board considered his extensive senior leadership experience at IAC and his related knowledge and experience regarding Match Group, as well as his high level of financial literacy and expertise regarding restructurings, mergers and acquisitions and operations, and his public company board and committee experience.[255]

These disclosures include but are not limited to: his service with Old IAC as CEO of the Retailing Division, the Executive Vice President, and CFO; and his service on boards of Old IAC affiliates like HSN, Inc.[256] The 2019 Form 10-K/A also disclosed that the Old Match Board considered, among other things, McInerney's "extensive senior leadership experience at [Old] IAC."[257]

---

[255] 2019 Form 10-K/A at 4–5. Old IAC did not acquire Ticketmaster until January 2003. IAC/InterActiveCorp, Proxy Statement (Schedule 14A) (May 10, 2012), at 17.

[256] 2019 Form 10-K/A at 4–5.

[257] *Id.* at 5.

In its opposition brief, Hallandale argues Old Match's 2019 Form 10-K/A failed to specifically disclose that "McInerney was a director of [Old] IAC-affiliated entities HSN, Inc. from 2008 to 2018, and Interval Leisure Group from 2008 to 2017" and "McInerney['s] ongoing relationship with Diller and [Old] IAC."[258] While the disclosures could have been more specific about the exact years of McInerney's HSN and ILG board service, they are not inaccurate.[259] The disclosures still state that McInerney had been employed by Old IAC or Old IAC affiliates for over a decade and then had served on Old IAC affiliate boards as recently as the past five years, which Delaware courts view as possibly "impugning" a director's independence.[260] Thus, although a more exhaustive disclosure of the parent companies of McInerney's employers and exact employment dates may have been "somewhat more informative,"[261] a reasonable stockholder would not have viewed

---

[258] PAB 57–58.

[259] *In re Mobile Commc'ns Corp.*, 1989 WL 997182, at *2 (Del. Ch. Apr. 3, 1989) (dismissing a disclosure claim where "the summaries are not inaccurate even if they are . . . very summary.").

[260] *See, e.g.*, *Franchi*, 2021 WL 5991886, at *5 ("The more extensive past business relationships between Shea and Icahn present a closer call than those of Firestone and Lewis. Of the past relationships, however, the vast majority ended at least ten years before the Merger, making it unreasonable to infer that they impugned Shea's independence from Icahn at the time of the Merger."); *Yucaipa Am. All. Fund II, L.P. v. Riggio*, 1 A.3d 310, 315 (Del. Ch. 2010) (rejecting independence challenge where director worked as controlling stockholder's subordinate over ten years before challenged transaction), *aff'd*, 15 A.3d 218 (Del. 2011).

[261] *Lynch*, 669 A.2d at 89.

that fact as significantly altering the total mix of available information regarding the relationship between McInerney and Old IAC.[262]

As to his relationship with Diller, Diller is not the counterparty to the Separation.[263] McInerney's relationship with Diller, who is not a fiduciary to Old Match stockholders, is consistent with and redundant of his relationship with IAC.[264] "Consistent and redundant facts do not alter the total mix of information," and do not need to be disclosed.[265]

Second, Hallandale argues the Proxy's disclosures regarding the effect of the 2015 Tax Sharing Agreement were materially misleading and incomplete. The Proxy incorporated the Match 2019 Form 10-K and Form 10-K/A, which attached the 2015 Tax Sharing Agreement as an exhibit and thereby told stockholders about the 2015 Tax Sharing Agreement and its terms, and stated that any "future spin-off

---

[262] *Arnold*, 650 A.2d at 1277 (quoting *TSC*, 426 U.S. at 449).

[263] Transaction Agr. at Recitals.

[264] This is so even taking as true Plaintiffs' allegations that Diller is IAC's controller. Am. Compl. ¶¶ 37, 157; Proxy at 270.

[265] *Abrons*, 911 A.2d at 813; *In re Merge Healthcare*, 2017 WL 395981, at *9 ("Redundant facts, insignificant details, or reasonable assumptions need not be disclosed." (citing *Abrons*, 911 A.2d at 813); *see also In re OM Grp., Inc. S'holders Litig.*, 2016 WL 5929951, at *15 (Del. Ch. Oct. 12, 2016) ("As in all matters of public disclosure, materiality is the touchstone of the board's disclosure duty. This is true with respect to the disclosure of director conflicts. And not every fact tending remotely to suggest that a board member's interest might differ in some respect from that of the stockholders amounts to a material omission." (footnote omitted) (citing *Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 122–23 (Del. Ch. 1986))).

by IAC of its interest" in Match would implicate Section 4(a) in that agreement.[266] Hallandale argues the disclosures are incomplete and misleading because the Proxy does not specifically disclose the 2015 Tax Sharing Agreement's Section 4(a) covenants governing a "Distribution" in the context of the Separation.[267] Hallandale contends the Proxy did not distinguish the Separation and explicitly state it was not governed by Section 4(a), and therefore was materially misleading.

I conclude the Proxy does not mislead stockholders that the 2015 Tax Sharing Agreement governs the Separation. Hallandale does not point to any disclosure that intimates the 2015 Tax Sharing Agreement governs the Separation or that the Separation Committee thought it did. Rather, the Proxy reveals some latitude around tax sharing, as it discloses that Old IAC and New IAC would enter into a new tax matters agreement, and discloses negotiations of the 2019 Tax Matters Agreement

---

[266] Proxy at 1–2, 19, 308–09; 2019 Form 10-K at 8; *id.* at Ex. 10.4 (attaching the 2015 Tax Sharing Agreement); 2019 Form 10-K/A at 24; *id.* at Ex. 10.4 (attaching the 2015 Tax Sharing Agreement); *see also supra* note 254.

[267] Am. Compl. ¶¶ 51–52, 175–76.

between the Committee's counsel and Old IAC's counsel.[268]  And the Proxy states

the Separation was not structured as a traditional spinoff.[269]

[268] Proxy at 144 (detailing the Separation Committee's response to IAC's initial proposal, "Debevoise also noted for the Match separation committee that restrictions *would be imposed* on New Match to ensure the intended tax treatment of the reverse spin-off in a tax matters agreement") (emphasis added); *id.* ("On October 25, 2019, Wachtell Lipton delivered to Debevoise a preliminary draft of certain tax sharing principles governing the allocation of tax liabilities between New IAC and New Match following the proposed separation transaction."); *id.* at 144–45 (discussing a draft term sheet on October 28, 29, and 30, 2019 "confirm[ing] that New Match would have the ability to make post-closing share issuances under the contemplated tax matters agreement between New Match and New IAC"; and confirming that "New IAC [would] indemnify[] New Match for all pre-closing non-Match IAC liabilities and for any impairment of the tax attributes of the IAC group expected to be available to the New Match group; and delivery of certain opinions by IAC's outside counsel relating to the U.S. federal income tax treatment of the transactions"); *id.* at 147 ("Also at this [November 7] meeting, a representative of Debevoise summarized issues raised in the tax sharing principles prepared by Wachtell Lipton.  The Match separation committee authorized Debevoise to negotiate with Wachtell Lipton regarding these issues."); *id.* (summarizing the November 8, 2019 proposal which included "New Match being allocated the tax benefits for any IAC options that it assumed under the tax matters agreement" and "accepted that there would be no post-closing compensation for certain impairments of the tax attributes (subject to the parties reaching agreement on their assumed value at closing)"); *id.* at 147–48 ("Mr. Levin conveyed IAC's proposal . . . premised on an agreement by Match to continue to make repurchases of Match common stock as needed to maintain tax consolidation with IAC . . . .  He further stated that IAC was willing to agree to the Match separation committee's proposed terms with respect to . . . the treatment of the tax attributes (subject to the agreement on valuation of such attributes) . . . ."); *id.* at 148 ("The Match separation committee also discussed IAC's proposal that New Match bear the entire cost of the IAC options to be assumed by New Match, with the benefit of the accompanying tax deduction accruing to New IAC, including that the option assumption was the principal element of the proposed transaction that involved a transfer of value from Match to IAC without a corresponding adjustment in the exchange ratio."); *id.* at 149 ("Also under these terms, IAC would bear 25% of the pre-tax cost of the intrinsic value of New Match options issued in respect of IAC option awards held by individuals other than Match employees, and IAC would compensate Match through an adjustment to the exchange ratio, for the notional tax benefit associated with the unreimbursed portion of the option cost and New IAC would be allocated the tax benefits for such options under the tax matters agreement."); *id.* ("On December 6, 2019, Wachtell Lipton sent an initial draft of the transaction agreement to Debevoise.  Wachtell Lipton, Debevoise and IAC's outside real estate counsel also exchanged drafts of various

More fundamentally, under the facts as Hallandale has pled them, the 2015 Tax Sharing Agreement was immaterial. Hallandale pleads the Separation was ***not*** a Distribution under the 2015 Tax Sharing Agreement, and faults the Proxy for not explicitly disclosing that the Separation was ***not*** governed by the 2015 Tax Sharing Agreement.[270] But in most instances, including this one, as a matter of logic, a

ancillary agreements relating to the transaction during this time period, including the tax matters agreement . . . ."); *id.* at 161 (summarizing the factors the Separation Committee weighed when considering whether to enter the transaction agreement, including the 2019 Tax Matters Agreement); *id.* at 58, 201–03 (summarizing the 2019 Tax Matters Agreement as an ancillary agreement to the transaction agreement); *id.* at Annex I (attaching the form 2019 Tax Matters Agreement); *id.* at I-30 § 11 (providing that the 2019 Tax Matters Agreement would terminate "all prior intercompany Tax allocation agreements or arrangements").

[269] Proxy at 137–39 (explaining each step of the Separation and illustrating the organization structure before and after the Separation); *id.* at 140 (noting the overall structure would be a "reverse spinoff . . . resulting in holders of IAC capital stock receiving a new class of capital stock of IAC and capital stock of the spun-off entity"); *id.* at 141 (noting it was advisable to structure a separation as a "'reverse' spin-off in which shares of IAC capital stock would be reclassified"); *id.* at 142–43 ("The initial proposal as conveyed was for a reverse spinoff transaction resulting in two separate public companies, New IAC and New Match, with New Match having a single class of 'one share, one vote' common stock."); *id.* at 144 ("At the meeting, representatives of Debevoise discussed with the Match separation committee certain tax issues raised by the reverse spin-off, including the ability of New Match to issue additional stock in the future following the separation transaction. Debevoise also noted for the Match separation committee that restrictions would be imposed on New Match to ensure the intended tax treatment of the reverse spin-off in a tax matters agreement.").

[270] *See, e.g.*, Am. Compl. ¶ 6 ("But the Proxy failed to disclose that the transaction IAC proposed to Match was not a distribution of Match stock to IAC stockholders as addressed in the 2015 Agreements. It was a transaction to which the restrictive provisions of the 2015 Agreements did not apply."); *id.* ¶ 53("[T]he Separation transaction IAC proposed and the Separation Committee and the Board accepted was not a "Distribution" as defined in [the] 2015 Agreements and Match was under no obligation to cooperation with IAC's tax consolidation scheme."); *id.* ¶ 98 ("The transaction proposed by IAC, and considered by the Separation Committee, ***was not a Distribution*** as contemplated by the Tax Sharing

constraint that does not apply to a given transaction is not material, particularly where other disclosures show deliberation free of that constraint. In any particular transaction, a company is subject to countless other obligations that do not bear on the board's decisionmaking; those obligations, or counterfactuals if those obligations did apply, are not material to the stockholders' consideration.[271] "[T]oo much information can be as misleading as too little."[272]

Third, and similarly, Hallandale argues the Proxy's disclosures were materially misleading and incomplete regarding the effect of the 2015 Investor Rights Agreement, particularly the provision requiring Match to cooperate with Old

---

Agreement."); *id.* ("The Separation was not a Distribution as contemplated by the Tax Sharing Agreement, and Match was under no obligation to accept the restrictive terms of the Tax Sharing Agreement covenants."); *id.* ¶ 176 ("Incorporated as it was by reference in the Proxy, Match had the obligation to disclose that the Separation's transactions **were not** restricted by the Tax Sharing Agreement because they were not a Distribution of Match's stock to [Old] IAC stockholders.").

[271] *See In re MONY Grp., Inc. S'holder Litig.*, 853 A.2d 661, 682 (Del. Ch. 2004) ("[A]s a general rule, proxy materials are not required to state 'opinions or possibilities, legal theories or plaintiff's characterization of the facts.'" (quoting *Seibert v. Harper & Row, Publ'rs, Inc.*, 1984 WL 21874, at *6 (Del. Ch. Dec. 5, 1984)); *In re JCC Hldg. Co. Inc., S'holders Litig.*, 843 A.2d 713, 721–22 (Del. Ch. 2003) (finding that disclosures are not inaccurate simply because plaintiffs disagree with them); *In re Gen. Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *17 (Del. Ch. May 4, 2005) (same), *aff'd*, 897 A.2d 162 (Del. 2006).

[272] *In re 3Com*, 2009 WL 5173804, at *6; *accord Skeen v. Jo–Ann Stores, Inc.*, 1999 WL 803974, at *4 (Del. Ch. Sept. 27, 1999) ("Balanced against the requirement of complete disclosure is the pragmatic consideration that creating a lenient standard for materiality poses the risk that corporations will 'bury the shareholders in an avalanche of trivial information a result that is hardly conducive to informed decisionmaking.'") (quoting *TSC*, 426 U.S. at 448–49)), *aff'd*, 750 A.2d 1170 (Del. 2000).

IAC in the event Old IAC decided to dispose of its interest. Stockholders knew about that agreement, as the Proxy incorporated by reference Match's 2019 10-K, which attached the Investor Rights Agreement.[273] Hallandale does not contend the Investor Rights Agreement swayed the Separation Committee; indeed, Hallandale contends the Separation Committee was fully empowered to say "no" to the Separation.[274] Nor does Hallandale contend the Proxy made any false statement about its import. Rather, Hallandale contends stockholders should have been told whether or how the cooperation obligation, or Defendants' "belief that Match was obligated to 'cooperate,'" affected the Separation's negotiation and structure.[275] Hallandale argues "[a] reasonable stockholder would find it material to know if the Separation was caused or at least affected by Defendants' belief that [Old] Match was obligated to 'cooperate' once [Old] IAC decided to dispose of its [Old] Match interest."[276]

---

[273] Proxy at 1–2, 19, 308–09; 2019 Form 10-K at 8; *id.* at Ex. 4.2 (attaching the Investor Rights Agreement); 2019 Form 10-K/A at 24; *id.* at Ex. 4.2 (attaching the Investor Rights Agreement).

[274] *See* Am. Compl. ¶ 13 (arguing the Separation Committee operated in "absence of any contractual obligations to accede to [Old] IAC's demands"); *id.* ¶ 65 ("The Separation Committee was not empowered to consider alternative transactions, but it was empowered to reject a potential separation with [Old] IAC."); *id.* ¶ 66 ("Notwithstanding its authority to say 'no,' the Separation Committee barely considered this power."); *see also supra* note 204, and accompanying text.

[275] *Id.* ¶ 174.

[276] *Id.*

"Delaware law does not require a play-by-play description of every consideration or action taken by a [b]oard."[277] Nor does it require disclosure of a board's every thought or consideration. *Goodwin v. Live Entertainment, Inc.* teaches that a "subjective belief about a party's bargaining position" does not constitute material information.[278]

> A contrary conclusion would place upon fiduciaries the untenable burden of describing fairly the state of mind of all relevant players since a discussion of only the leverage a board had over one seller might be a materially misleading partial disclosure without a discussion of the presence or absence of leverage it or the acquiror had over other sellers or over the acquiror.[279]

Here, the Proxy disclosed what the Board considered to be Match's rights and obligations to Old IAC under the 2015 Investor Rights Agreement. The Proxy incorporated the Match 2019 10-K and 10-K/A, which each included their own disclosures about the 2015 Investor Rights Agreement and both SEC filings attached it as an exhibit.[280] Hallandale failed to plead that an additional disclosure about the

---

[277] *In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 511–12 (Del. Ch. 2010).

[278] 1999 WL 64265, at *10 (Del. Ch. Jan. 25, 1999), *aff'd*, 741 A.2d 16 (Del. 1999); *see also Se. Pa. Transp. Auth. v. Volgenau*, 2013 WL 4009193, at *20 (Del. Ch. Aug. 5, 2013) ("One problem with the Plaintiff's complaint is that it would require SRA to disclose the subjective beliefs, opinions, and statements of a third-party involved in the bidding process. To require this type of disclosure generally would risk disclosing speculative, inaccurate, and useless information." (footnote omitted)), *aff'd*, 91 A.3d 562 (Del. 2014).

[279] *Goodwin*, 1999 WL 64265, at *10.

[280] Proxy at 1–2, 19, 308–09; 2019 Form 10-K at 8; *id.* at Ex. 10.4 (attaching the 2015 Tax Sharing Agreement); 2019 Form 10-K/A at 24; *id.* at Ex. 10.4 (attaching the 2015 Tax Sharing Agreement); *see also supra* note 254.

Separation Committee's beliefs about Old Match's cooperation obligations under the 2015 Investor Rights Agreement, specifically, would alter the total mix of information available to stockholders.[281] And, again, Hallandale seeks disclosure of a counterfactual to its facts as pled; Hallandale insists the Separation Committee was empowered to say no to the Separation. Hallandale has failed to plead a disclosure violation in connection with the 2015 Investor Rights Agreement.

Finally, Hallandale alleges the Proxy's disclosures about the Separation's governance changes "were false and misleading because the purpose of the governance provisions was not to protect New Match stockholders, but rather was to protect New IAC from a transaction that threatened the tax-free treatment."[282] The Proxy disclosed the Board's reasons for structuring the Separation as it did, including the governance provisions Hallandale challenges here. Specifically, the Proxy describes the governance provisions as defensive anti-takeover measures to prevent a change of control.[283] This Court has long rejected arguments that disclosures are materially misleading because "they fail to disclose [the] *real* reason" behind board action because "as a general rule, proxy materials are not required to state 'opinions or possibilities, legal theories or plaintiff's characterization of the

---

[281] *See Goodwin*, 1999 WL 64265, at *10 (rejecting the argument that a "subjective belief about a party's bargaining position constitutes material information").

[282] Am. Compl. ¶ 168; *see also id.* ¶ 166.

[283] Proxy at 9, 63–64, 279.

facts.'"[284]  "[D]isclosures relating to the Board's subjective motivation or opinions are not *per se* material, as long as the Board fully and accurately discloses the facts material to the transaction."[285]  "Put more simply, asking 'why' does not state a meritorious disclosure claim under our law."[286]  That Hallandale believes the Old Match Board had additional motivations (i.e., protecting New IAC's tax treatment) to agree to the governance structure it did, does not make the disclosures false or misleading.

Hallandale's Amended Complaint raises additional claims regarding purportedly misleading or omitted disclosures, such as whether New Match will have "improved strategic flexibility," "the transaction will provide 'increased trading liquidity for New Match common stock and the potential for future eligibility

---

[284] *MONY*, 853 A.2d at 681–82 (quoting *Seibert*, 1984 WL 21874, at *6); *Rouse*, 2018 WL 1226015, at *24 (finding where the proxy disclosed why the board implemented a retention plan and the benefits of doing so, plaintiffs' allegation that "the disclosures relating to the Retention Plan were misleading because the Proxy did not describe why the plan was necessary and how precisely it benefited Rouse" failed); *Herd v. Major Realty Corp.*, 1990 WL 212307, at *10 (Del. Ch. Dec. 21, 1990) ("[T]he general rule is that alleged motives need not be disclosed . . . ."); *The Trade Desk*, 2022 WL 3009959, at *18 ("Here, Green's purported need for liquidity was not based on Company information that was secretly withheld from the other directors.  Instead, it was, at best, Green's subjective motivation for proposing the Dilution Trigger Amendment."); *In re USG Corp. S'holder Litig.*, 2020 WL 5126671, at *22 (Del. Ch. Aug. 31, 2020) (finding that it was not reasonably conceivable that there was a material omission regarding the Board's motives).

[285] *MONY*, 853 A.2d at 682.

[286] *In re Merge Healthcare*, 2017 WL 395981, at *13 (alterations and internal quotation marks omitted) (quoting *In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1131 (Del. Ch. 2011)).

for inclusion in stock market indexes,'" or the valuation of these alleged benefits.[287] Hallandale does not address these points in its opposition brief, so I consider them waived.[288]

* * * * *

In sum, for the reasons stated above, Hallandale has failed to plead facts sufficient to call into question any of the six elements in the *MFW* framework. Thus, the Separation is subject to the business judgment rule.[289] The only claim that Hallandale could state that would overcome the otherwise irrebuttable application of the business judgment rule is a claim for waste.[290] It has not even attempted to make such a claim, "which is available only in theory, because the fact of stockholder approval indicates that the [Separation] was on terms that persons of ordinary, sound judgment could accept."[291] Consequently, Hallandale's remaining direct claims are dismissed.[292]

---

[287] Am. Compl. ¶¶ 171–72 (quoting Proxy at xx).

[288] *In re Merge Healthcare*, 2017 WL 395981, at *9 (citing *Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, 2007 WL 2982247, at *11 (Del. Ch. Oct. 9, 2007)); *Emerald P'rs*, 726 A.2d at 1224.

[289] *The Trade Desk*, 2022 WL 3009959, at *23 (citing *Crane*, 2017 WL 7053964, at *21).

[290] *Id.* at *23 ("Under the version of the business judgment rule earned by proper implementation of the *MFW* framework, only a well-pleaded claim for waste may survive." (citing *Dell*, 2020 WL 3096748, at *14)).

[291] *Voigt*, 2020 WL 614999, at *10 (citing *Singh v. Attenborough*, 137 A.3d 151, 152 & n.3 (Del. 2016) (ORDER)).

[292] *Larkin v. Shah*, 2016 WL 4485447, at *21 (Del. Ch. Aug. 25, 2016) (citing *Singh*, 137 A.3d at 151–52 ("When the business judgment rule standard of review is invoked because

## III. CONCLUSION

For the foregoing reasons, the Defendants' Motions to Dismiss are **GRANTED**, and the Amended Complaint is dismissed with prejudice.

---

of a vote, dismissal is typically the result.")). Since the business judgment rule applies and no waste claim was pled, I need not address the Director Defendants' defense under 8 *Del. C.* § 102(b)(7). *See Rouse*, 2018 WL 1226015, at *25 n.211.